[No. A065167. First Dist., Div. Five. July 7, 1995.]

WILLIE THOMPSON, a Minor, etc., Plaintiff and Appellant, v.
PAUL N. HALVONIK et al., Defendants and Respondents.

## COUNSEL

Ernest M. Thayer, Padway & Padway and Laurence F. Padway for Plaintiff and Appellant.

Paul N. Halvonik and Fred J. Hiestand, in pro. per., for Defendants and Respondents.

## OPINION

**HANING, J.**—Plaintiff/appellant Willie Thompson, a minor, by and through his guardian ad litem Patricia Thompson, appeals a summary judgment in favor of defendants/respondents Paul N. Halvonik, Halvonik & Halvonik, Fred J. Hiestand, and Deborah Hinkel Halvonik in his action for legal malpractice. He principally contends there are triable issues of fact as to whether respondents failed to prosecute his underlying medical malpractice action diligently and whether, as a result, his settlement of the medical malpractice action was less favorable than it would have been with diligent prosecution. He also contends the trial court erroneously sustained without leave to amend respondents' demurrer to his causes of action for intentional and negligent misrepresentation, and fraudulent concealment. We affirm.

### FACTS

The following facts are undisputed. Appellant was born at Vesper Memorial Hospital, San Leandro, on November 5, 1982. While still in the hospital he became infected with citrobacter diversus. As a result, he developed meningitis, which in turn caused severe mental retardation, seizure disorder, and shunt dependency.

In June 1987 appellant's mother, Patricia Thompson, met with respondent Paul Halvonik to discuss a possible medical malpractice action on behalf of appellant. Respondents were aware of a pending case (the Booth case) against Vesper filed on behalf of a girl born at Vesper two weeks after appellant, who had contracted the same disease and sustained the same resulting injuries. In August and October 1987 respondents met and corresponded with the attorney representing the Booth girl. Booth's attorney gave

respondents some material and agreed to provide them with discovery from her case. In October 1987 respondent Halvonik & Halvonik and Patricia Thompson entered into a contingency fee agreement to represent appellant in any claims for damages resulting from his immediate postnatal care.

In March 1988 the Booth case settled. In October 1988 respondent Hiestand was associated on the case. On October 12, 1988, respondents filed a medical malpractice action on appellant's behalf. (Thompson v. Vesper Hospital (Super. Ct. Alameda County, 1988, No. 632000-7).) The Booth attorney subsequently notified respondents that due to a confidentiality provision in the Booth settlement, he was not permitted to provide them any further discovery.

Between January 1989 and September 1990 respondent Hiestand spoke with several of appellant's health care providers to obtain information necessary to answer Vesper's interrogatories. Respondents did not otherwise talk to appellant's treating health care providers, meet appellant, arrange to film or videotape him, or consult with a neonatologist or infectious disease specialist. They did not visit the Vesper nursery, although interrogatories propounded to Vesper inquired about government inspections thereof. They submitted to Vesper form and specially prepared interrogatories and motions to produce documents. They attended depositions noticed by Vesper, but did not depose anyone themselves, and did not get the case set for trial.

In September 1990 Patricia Thompson substituted the law firm of Padway & Padway for respondents. In May 1991 the Padway firm settled the case on behalf of appellant for $1,769,201, a sum twice that of the Booth case settlement.[1]

Appellant brought the instant action on August 16, 1991. He alleged generally that respondents failed to act with reasonable care and diligence in prosecuting his case, resulting in loss of value of his claim against Vesper and loss of use of the settlement proceeds of that claim. Specifically, he alleged damages of approximately $525,000 for loss of use of the settlement proceeds, damages according to proof for loss of value of his claim, and damages of approximately $25,000 for the additional expenses required to complete discovery and attempt to cure deficiencies in the state of the evidence and discovery created by respondents' negligence.

The trial court granted summary judgment for respondents on the ground that appellant's evidence that he would have obtained a better settlement had respondents proceeded more diligently was too speculative to support his claim for damages.

---

[1]The hospital's carrier paid $500,000 in cash and $1,269,201 for an annuity.

## DISCUSSION

### I

Appellant first contends summary judgment was improperly granted because there are triable issues of fact concerning both liability and damages. Summary judgment is mandatory where no triable issues exist as to a material fact, and if the documentation submitted on the motion entitles the moving party to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) When, as here, defendants seek summary judgment, their supporting documentation must either establish a complete defense to the plaintiff's action or demonstrate an absence of an essential element of the plaintiff's case. When defendants establish the foregoing, and the plaintiff's opposing documentation does not show either a triable issue of fact with respect to the defense or that an essential element exists, summary judgment should be granted. (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785]; *Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].) These general principles also apply to an appellate court's review of a summary judgment ruling, which is conducted de novo. (See *Stationers Corp.* v. *Dun & Bradstreet, Inc., supra;* see also *AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].)

In order to establish a cause of action for legal malpractice the plaintiff must demonstrate: (1) breach of the attorney's duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a proximate causal connection between the negligent conduct and the resulting injury; and (3) actual loss or damage resulting from the negligence. (*Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433].)

There are triable factual issues as to whether respondents' prosecution of the underlying case fell below the standard of care. Nevertheless, we conclude summary judgment was properly granted because of the absence of evidence of damage resulting from any delay in prosecuting the action.

Unless a party suffers damage, i.e., appreciable and actual harm, as a consequence of his attorney's negligence, he cannot establish a cause of action for malpractice. Breach of duty causing only speculative harm is insufficient to create such a cause of action. (*Budd* v. *Nixen, supra,* 6 Cal.3d at p. 200.) "[D]amages may not be based upon sheer speculation or surmise,

and the mere possibility or even probability that damage will result from wrongful conduct does not render it actionable. [Citation.]" (*In re Easterbrook* (1988) 200 Cal.App.3d 1541, 1544 [244 Cal.Rptr. 652].) Neither appellant's complaint nor his documentation opposing respondents' motion for summary judgment state any facts demonstrating actual damage resulting from respondents' delay in handling the underlying action.

Appellant argues that he presented evidence of "three species" of damage caused by delay: (1) physical regression due to Patricia Thompson's inability to pay for speech therapy; (2) loss of value of the settlement due to changes in the financial market; and (3) loss of key evidence due to the confidentiality provision of the Booth settlement impairing his ability to prove his case against Vesper, specifically the deposition taken in the Booth case of Gale Correia, a nurse in Vesper's nursery believed to be the source of appellant's infection.

As to physical regression, appellant cites the declaration of the speech pathologist who began speech therapy with him in 1989. The pathologist stated that at times between 1989 and 1991 she provided several sessions per week of individual therapy, during which appellant progressed, and at other times he received group therapy once or twice per week at school, during which he regressed. She further stated that when individual therapy was stopped during this period, it was for financial reasons. In her opinion, his development was delayed by the failure to provide additional individual therapy during the 1989-1991 period. "This changed when more aggressive speech therapy was provided starting in April, 1991."

As to loss of value, appellant cites a comparison by an economist of his May 1991 settlement, reached nine months after the Padway firm was substituted for respondents, with the same settlement hypothetically reached on May 1, 1988, approximately eight months after the parties executed the contingency fee agreement. The economist concluded that a "1991 settlement is less advantageous than a 1988 settlement for two reasons: first, interest rates were higher in 1988, thereby providing more benefits for a given premium dollar; and second, substandard underwriting (rated age assessment) has become more conservative since 1988 which also reduces the benefit per premium dollar."

As to lost evidence, appellant cites testimony of Nurse Paula Quinn from a deposition she gave in the underlying case after the Padway firm was substituted for respondents. The deposition was taken by Vesper. Quinn testified that she had been retained as an expert by Booth in the Booth case,

but had destroyed the documents and notes from that case. She was asked whether, as she reviewed the depositions "of the four individuals that were provided to you," she remembered what these individuals said in their Booth case depositions. She replied: "In Gale Correia's deposition, I remembered in the Booth case that there had been quite a bit of discussion about her hand washing practices. [¶] Specifically concerning jewelry that she wore and what she did with that jewelry and what she used to wash her hands. [¶] I remember that she did wear a ring and that she did a variety of things with it—[¶]—during the times that she scrubbed. [¶] Like pinning it to her uniform or putting it in her pocket." (Deposition questions omitted.) Quinn remembered these details because she and the Booth lawyer conferred "about these issues" and because these details "seemed unusual to me." She further testified that she told Attorney Padway that she remembered this previous deposition testimony and felt it was an indication that the nurse did not follow the same routine each time she washed her hands. Finally, she testified that although "the depositions" indicated inconsistent hand washing procedures, they did not indicate inappropriate procedures. It is unclear from the record whether Quinn is being asked here about Booth depositions or depositions taken in appellant's underlying malpractice action. Appellant asserts that Correia's testimony regarding hand washing in her Booth deposition differed significantly from her testimony on this issue in his deposition, but he did not include the latter deposition testimony among his documentation opposing respondents' motion for summary judgment.

None of this evidence does more than suggest speculative harm, because it does not demonstrate that but for respondents' delay, appellant's underlying case would have settled at all, let alone at an earlier date, for the same amount, or with the same structure. ■ "Damage to be subject to a proper award must be such as follows the act complained of as a legal certainty . . . ." (*Agnew* v. *Parks* (1959) 172 Cal.App.2d 756, 768 [343 P.2d 118].) ■ Even if appellant would have benefited by receiving money for therapy and other care at an earlier date, absent evidence that Vesper would have settled with respondents under exactly the same circumstances it settled with the Padway firm, actual harm from respondents' conduct is only a subject of surmise, given the myriad of variables that affect settlements of medical malpractice actions. ■ "[T]he mere probability that a certain event would have happened, upon which a claim for damages is predicated, will not support the claim or furnish the foundation of an action for such damages. [Citations.]" (*Campbell* v. *Magana* (1960) 184 Cal.App.2d 751, 758 [8 Cal.Rptr. 32]; *Williams* v. *Wraxall* (1995) 33 Cal.App.4th 120, 130-131 [39 Cal.Rptr.2d 658].)

■ In their detailed petition to compromise appellant's claim, his attorneys, who also represent him in this case, advised the court that he "will

receive more than twice the settlement obtained by Krista Booth, the one other minor born in [the hospital's] nursery to become infected with citrobacter diversus meningitis, and who suffered injuries as serious or more serious than [appellant] herein. Liability in this case is significantly more difficult than in *Booth* because [appellant] was the first baby known to have been infected with the citrobacter organism. Hence, [the] Chief of Infectious Diseases for the Alameda County Health Department, was able to testify that the Booth baby was infected by a hospital nurse, but with respect to [appellant], he was unable to say whether [appellant] was infected by the nurse or vice versa." The petition does not state that the value of appellant's case was affected by any negligent act or omission of his former counsel. The paragraph in the petition entitled "Difficulty of proof" makes no mention of any error or omission by respondents that caused a settlement less than the actual value of the case. Nor does the petition indicate that the case was settled for less than its fair value. In short, there is nothing in the record to show that appellant can establish any actual damages resulting from respondents' alleged negligence.

II

Appellant also contends the court erred in sustaining respondents' demurrer to his causes of action for fraud, negligent misrepresentation, and fraudulent concealment (causes of action 3, 4, and 5, respectively). As to each of these three causes of action appellant alleged generally that from October 1987 to September 1990 respondents intentionally or negligently misrepresented that they would and were vigorously prosecuting his medical malpractice case, and that these misrepresentations damaged him by devaluing his claim against Vesper and depriving him the use of settlement proceeds. Respondents' demurrer to causes of action 3 through 5 on grounds of, inter alia, uncertainty as to the fact of damage was sustained without leave to amend.

The short answer to appellant's contention is that any claim of error concerning the demurrer is rendered moot by the summary judgment. The summary judgment proceedings demonstrated that appellant could not establish a viable claim for damages, and appellant's causes of action for misrepresentation and concealment were based on the same conduct and alleged the same resulting damage as the negligence and breach of contract causes of action that were summarily adjudicated against him. Consequently, no prejudicial error exists.

The judgment is affirmed.

Peterson, P. J., and King, J., concurred.

A petition for a rehearing was denied August 2, 1995, and appellant's petition for review by the Supreme Court was denied September 21, 1995.