[No. A128544. First Dist., Div. Two. Nov. 20, 2012.]

JAMES FILBIN et al., Plaintiffs and Appellants, v.
HERMAN H. FITZGERALD et al., Defendants and Appellants.

COUNSEL

William Keith Brewer; Law Offices of Daral B. Mazzarella, Daral B. Mazzarella; Boudreau Williams and Jon R. Williams for Plaintiffs and Appellants.

Hayes, Scott, Bonino, Ellingson & McLay, Mark G. Bonino, Miya R. Peard, Stephen A. Scott; Lewis Brisbois Bisgaard & Smith, Peter Dixon and Alexander A. Graft for Defendants and Appellants.

## OPINION

**RICHMAN, J.**—There is a type of attorney malpractice lawsuit known as a "settle and sue" case, which involves a former client suing after litigation has been settled. Depending on whether the disgruntled client was the plaintiff or the defendant in the antecedent lawsuit, the basis of the claim is that the settlement was less than it should have been, or more than it had to be, by reason of the negligence of the party's attorney. Obviously, the manner in which the underlying lawsuit was concluded will often make it problematic whether causation and damages can be established.

Here, the trial court awarded the former clients more than half a million dollars for the malpractice committed by their former attorney while representing them in an eminent domain proceeding. The court concluded that even though the attorney's negligence occurred prior to the eventual settlement—a settlement they agreed to while represented by a successor attorney—various actions by the attorney were below the standard of professional care and caused the clients to settle for $574,000 less than they would otherwise have received. The court further concluded that, notwithstanding his malpractice, the former attorney was entitled to recover approximately $242,000 for the quantum meruit value of his services.

Both sides have appealed. On the attorney's appeal from the malpractice judgment, we reverse, concluding that as a matter of law there is no causal connection between the attorney's assertedly negligent acts and omissions and the amount the clients received when they settled. On the clients' appeal from the quantum meruit judgment, we affirm.

## BACKGROUND

### The Property

In 1978, James and Carolyn Filbin purchased a 13-acre parcel of unimproved real property adjacent to what is now the San Luis Obispo County

Regional Airport. Thereafter, the Filbins began "stockpiling" material on their property, material subsequently described (by the San Luis Obispo County judge trying the eminent domain case) as "concrete, asphalt, and soil, as well as scrap metal, wood, inoperative vehicles, and other debris." The nature of the material apparently accounts for the various references to the property as a "junk place."

The Filbins' practice came to the unfavorable attention of county and state officials. The ensuing hostility fueled a lengthy chapter of administrative and legal proceedings, and even a misdemeanor criminal conviction with a probation violation. A dispute about the property's being rezoned soon after the Filbins' purchase aggravated matters. And in 2004 San Luis Obispo County (the County) decided to acquire the property through eminent domain.

### The Eminent Domain Action

On June 6, 2006, the County commenced judicial proceedings to acquire the property. After obtaining an order for immediate possession of the property (see Code Civ. Proc., § 1255.410),[1] the County's initial offer to purchase the property was $1.25 million.[2]

The following month the Filbins retained Herman H. Fitzgerald[3] an attorney with considerable experience in condemnation proceedings. Fitzgerald negotiated a "relocation settlement agreement" with the County, but the Filbins repudiated it. Fitzgerald made an investigation and concluded, contrary to

---

[1] Subsequent statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2] The County was employing what is known as the "quick-take" procedure, which our Supreme Court has summarized as follows: "California's statutory Eminent Domain Law (Code Civ. Proc., § 1230.010 et seq.) provides that . . . [t]he condemner may . . . take early possession of the property before litigation is concluded 'upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation.' [Citations.] . . . Because compensation is immediately available to the property owner in a quick-take action, the date of valuation of the property is statutorily required to be no later than the date the condemner deposits 'probable compensation' for the owner. [Citation.] . . . The property owner can immediately withdraw the funds, but by doing so waives all rights to dispute the taking other than the right to challenge the amount of just compensation. (§ 1255.260.)" (*Mt. San Jacinto Community College Dist. v. Superior Court* (2007) 40 Cal.4th 648, 653 [54 Cal.Rptr.3d 752, 151 P.3d 1166], fn. omitted.) Exactly three months after the County filed its initial complaint, the court signed an order allowing the Filbins to withdraw slightly less than $780,000. However, the Filbins did not actually withdraw this sum until February 2007. After federal tax liens were satisfied, only $142,928.62 of the County's deposit remained when the case ultimately settled.

[3] Subsequent references to "Fitzgerald" include both his individual and professional (Law Offices of Herman H. Fitzgerald) identities.

Mr. Filbin's insistence, that there was nothing improper about the rezoning. Leslie J. Gilman, the appraiser engaged by Fitzgerald on behalf of the Filbins, valued the property at $4,535,000. Mr. Filbin, a former real estate broker, believed the property was worth between $12 million and $15 million.

In May 2007, as the case wended its way to trial, the court rejected a stipulation arranged between the parties that the stockpiled material would be included in fixing the value of the property. The court concluded that the Filbins' "wholesale disregard of local and state land use regulations" amounted to "a remarkable history of recalcitrance" and "a repetitive pattern of illegality" sufficiently egregious to warrant "an order prohibiting Filbin from presenting to the jury any evidence showing that the stockpiled material has a fair market value above zero." At the same time, "The County will be permitted to show the diminution in value, if any, due to negative abatement costs."

In July 2007, with trial less than a month away, the Filbins had to decide on the mandatory settlement offer required by section 1250.410[4] (section 1250.410). This was just after the Gilman appraisal was completed. Fitzgerald advised the Filbins that "the law requires" that the property owners' settlement offer be "less than what the appraisal opinion to be testified will be." This advice was set forth in a letter to the Filbins dated July 24, 2007, which reads in pertinent part as follows: "The Eminent Domain Law requires that both sides make an effort to try to settle the case prior to trial. This is done by way of an exchange of an offer and a demand from the parties. The property owner *must* file with the Court and serve upon the County a demand to settle the case and the County *must* file an offer to settle and serve it upon the property owner 20 days before trial, which will be July 31. *The law generally requires that the property owner must make his demand to settle in a figure*

---

[4] Section 1250.410 provides in pertinent part:

"(a) At least 20 days prior to the date of the trial on issues relating to compensation, the plaintiff shall file with the court and serve on the defendant its final offer of compensation in the proceeding and the defendant shall file and serve on the plaintiff its final demand for compensation in the proceeding. The offer and the demand shall include all compensation required pursuant to this title, including compensation for loss of goodwill, if any, and shall state whether interest and costs are included. These offers and demands shall be the only offers and demands considered by the court in determining the entitlement, if any, to litigation expenses. . . .

"(b) If the court, on motion of the defendant made within 30 days after entry of judgment, finds that the offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable viewed in the light of the evidence admitted and the compensation awarded in the proceeding, the costs allowed pursuant to Section 1268.710 shall include the defendant's litigation expenses. [¶] . . . [¶]

"(d) If timely made, the offers and demands as provided in subdivision (a) shall be considered by the court on the issue of determining an entitlement to litigation expenses.

"(e) As used in this section, 'litigation expenses' means the party's reasonable attorney's fees and costs, including reasonable expert witness and appraiser fees." (§ 1250.410.)

*less than what the appraisal opinion to be testified will be* and that the County must raise its offer to settle over and above what its appraisal testimony will be in Court. The significance of the 'Final Offer' and 'Final Demand' is that the Court has the discretion to award litigation expenses consisting of attorney fees, witness fees, and appraisal fees to the property owner . . . if the Court determines that the offer made by the County is unreasonable and the demand made by the owner(s) is reasonable, all viewed in light of the jury verdict. This is completely discretionary with the trial judge and there is no statutory standard by which the judge can make such a determination. *The decisional law (that is the cases that are reported on appeal) generally indicate that in order to be reasonable, the public agency should raise its offer somewhere between 10% and 25% and, correspondingly, the property owner must reduce its demand by the same corresponding 10% to 25% reduction. I stress, however, that the law does not require any type of percentage change,* but only that the Court make a finding that the public agency's offer is unreasonable and that the property owner's demand is reasonable, all viewed in light of the jury verdict. Although these rules may be fairly clear on the[ir] face, the application of these rules varies from judge to judge and there is no way to predict just exactly what would happen." (Italics added.)

The Filbins refused to settle for less than the amount of the Gilman appraisal, and actually wanted to increase it to $9.1 million. They also wanted to get a new appraisal. Because this was contrary to Fitzgerald's advice, and because the Filbins refused to budge, Fitzgerald was discharged as their counsel. It was July 31, 2007, less than three weeks before trial.

The Filbins filed a declaration in which they advised the court that Fitzgerald had quit as their attorney. They also filed an application for a continuance. Fitzgerald responded with a letter advising the court: "In the later afternoon of July 31, 2007, defendant James P. Filbin discharged this office . . . . I will appear at the presently scheduled Trial Readiness Conference on Friday, August 3, 2007 . . . in order to enter the discharge on the record pursuant to Code of Civil Procedure section 284."

On August 2, the County increased its offer to $1.8 million.[5]

---

[5] The increase in the County's offer was largely illusory. As Fitzgerald explained it in his statement for the trial readiness conference: "[The County's] real estate appraiser . . . has appraised the total property at $1,788,875, or approximately $3.00 per square foot, less a deduction for stockpile removed [*sic*: removal] at $330,000 and a deduction for hazardous material remediation at $130,000 and a 'risk adjustment' of $132,888 leaving a net land value of $1,200,000." Thus, the revised offer was actually a net drop of $50,000 from the County's initial offer.

The following day, August 3, the date of the readiness conference, San Luis Obispo Judge Charles S. Crandall conducted an in camera hearing about Fitzgerald's discharge. Fitzgerald had filed his own declaration advising Judge Crandall that he had not quit but had been discharged, and was forwarding the case file to the Filbins' new counsel. Fitzgerald later testified how he came to speak at the readiness conference about his discharge: "Mr. Filbin advised the Court that his position was compromised and that I had sold him out. The Court asked me . . . if I wanted to respond to that, and I did respond to it."[6]

The Filbins engaged new counsel, William Brewer, the lawyer Mr. Filbin told Judge Crandall on August 3 was already "studying the matter." Mr. Brewer promptly commissioned two additional appraisals, another by Gilman and one by a new appraiser, Thomas Diamond. Gilman's second effort, made with an "extraordinary assumption" concerning rezoning of the property, specified the parcel's value at $6.8 million. Operating with the same assumption, Diamond's number was $7.1 million. The Filbins' final settlement demand was $5.8 million.

Notwithstanding his indicated disinclination, Judge Crandall did grant the Filbins a continuance, but with the strict proviso that the case would be "frozen," with no information or discovery generated subsequent to Fitzgerald's discharge allowed at the trial, now set for October, and the Filbins would be bound by Fitzgerald's stipulation that the property was not improperly rezoned.

---

[6] The record includes a partial transcription—but not a reporter's transcript—of the in camera hearing held on August 3, at which Fitzgerald and Mr. Filbin discussed with Judge Crandall the reasons for Fitzgerald's departure. It appears from the transcript that counsel for the County was not present, and that the Filbins had filed an application for a continuance, which Judge Crandall indicated would be denied. In the course of pointing out the disadvantages of the Filbins discharging Fitzgerald, Judge Crandall told the Filbins that Fitzgerald was "one of the best lawyers in the field," "one of the best counsel that I've seen," and "an extraordinarily capable lawyer . . . [¶] . . . [¶] with an incredible amount of experience." After hearing of the particulars of the disagreement, Judge Crandall told Mr. Filbin that Fitzgerald's discharge would not justify the continuance: "[L]ooking at it as objectively as I can[, y]ou are in the wrong. I mean you are just doing it because you have become emotionally involved, you have a personal stake, you have a life investment out there. All of which I understand, but he [(Fitzgerald)] is giving you objective advice telling you that you should do this and you do not want to do it . . . so you fire him . . . and . . . that does not, in my view, give you grounds to seek a continuance of this whole thing which has been set for a long time." Mr. Filbin told Judge Crandall that he had "another lawyer studying the matter right now." That lawyer, William Brewer, subsequently became counsel for the Filbins in the eminent domain action and the malpractice action, and is one of three attorneys listed on the briefs in this appeal.

Trial was under way when, on October 19, 2007, the Filbins accepted the County's offer of $2,561,215.51 plus accrued interest of $48,588.85. Allowing for the amount already withdrawn by the Filbins, and other claims, the net to the Filbins was $1,411,215.51.

### The Malpractice Action

In August 2008, the Filbins commenced this action in San Mateo Superior Court against Fitzgerald with a complaint for "attorney malpractice" and "breach of fiduciary duty." Fitzgerald responded with a cross-complaint to recover the quantum meruit value of the legal services he had provided to the Filbins.

A bench trial began on October 20, 2009, and ended six court days later on October 29. After all evidence had been presented, counsel for the Filbins summarized his argument why Fitzgerald was liable for $2,715,195.64:[7] "The evidence in this case is clear from our perspective that he failed to properly work up the case, he failed to properly prepare his experts, he failed to properly represent the Filbins. And then in the last few days before trial, 17 calendar days before this matter was set for trial he abandoned them and left them to find new counsel and get new counsel up to speed. [¶] . . . [¶] One thing is clear. That because of Mr. Fitzgerald's negligence the Filbins have been damaged and have been damaged to the tune of millions of dollars." In terms of particulars, Fitzgerald was faulted for not pursuing compensation for the "stockpile" on the Filbins' property, and the "probability of rezoning" the property.

However, counsel candidly, if obliquely, conceded that the issue of causation was murky: "Frankly, Mr. Filbin has taken the position throughout this case I screwed up and we can't sort it out. I'm not asking Mr. Fitzgerald to pay me the million and a half dollars of value that I lost. It may have been Judge Crandall's fault. It may have been Mr. Fitzgerald's fault. Or really, it might have been Mr. Filbin's fault."

On March 19, 2010, the court entered a "Statement of Decision and Order of Judgment on Complaint" concerning the Filbins' complaint, the pertinent portions of which (with minor nonsubstantive editorial alterations) provide as follows:

"Plaintiffs allege numerous actions by Defendant Fitzgerald which Plaintiffs contend were below the standard of care. The Court finds that Mr. Filbin

---

[7] This figure was calculated by using the highest appraisal of $7.1 million, "offset" by the approximate $2.6 million of the settlement, and then discounted by Fitzgerald's claimed percentage of recovery in settled cases.

engaged in unreasonable conduct with respect to the property, resulting in actual criminal prosecution and conviction, and that he harbored unrealistic opinions regarding the value of the property. The Court finds Mr. Filbin's conduct and opinions in this regard created difficulties for Fitzgerald in representing the Filbins. The Court finds Fitzgerald's conduct prior to his discussion with the Filbins regarding the pretrial demands and offers addressed by CCP § 1250.410 complied with the standard of care.

"It is undisputed, however, that Fitzgerald misrepresented the law in advising the Filbins that they were 'required' to present a settlement demand lower than the appraisal of Plaintiffs' designated valuation expert, Les Gilman. By misstating the law to Mr. Filbin, on a point of major importance to Mr. Filbin, Fitzgerald's action was below the standard of care.

"Following Fitzgerald's misstatement of law, the Court finds that there was a breakdown in the attorney-client relationship which resulted in Fitzgerald appearing before Judge Crandall on his Motion to Withdraw. A hearing on the Motion to Withdraw could have been avoided by a written Substitution of Attorney form, which Fitzgerald did not realize could have been used. Mr. Fitzgerald was incorrect in that regard.

"Fitzgerald again misstated the law to Judge Crandall at the time of the Motion to Withdraw. Judge Crandall accepted that incorrect statement of law as fact, and addressed Mr. Filbin in a manner which made it apparent that Judge Crandall believed Mr. Filbin sought to deviate from the requirements of law. Fitzgerald's misstatement of law to Judge Crandall was also below the standard of care.

"Although Plaintiffs allege a breach of fiduciary duty by Fitzgerald resulting from negative comments about his client unnecessarily made to Judge Crandall, the Court believes that Judge Crandall would have wanted information to justify terminating the attorney-client relationship on the eve of trial. In addition, the Court finds that Plaintiffs' ethics expert, Carol Langford, Esq., was unpersuasive based upon limited qualifications. Then Court believes that a judge is, in addition, presumably able to accept negative information about a litigant without becoming biased. The Court, however, does not reach this issue factually, and did not formulate an opinion whether or not Judge Crandall became biased against the Filbins as a result of the disclosures made by Fitzgerald during the Motion to Withdraw. Plaintiffs' claim for breach of fiduciary duty is denied.

"Fitzgerald's breaches of the standard of care are a legal cause of damage under the significant burden of proof set forth in *Marshak v. Ballesteros* (1999) 72 Cal.App.4th 1514 [86 Cal.Rptr.2d 1], and *Slovensky v. Friedman* (2006)

142 Cal.App.4th 1518 [49 Cal.Rptr.3d 60], and the Court expressly rejects the lesser burden of proof set forth in the case of *Viner v. Sweet* (2003) 30 Cal.4th 1232 [135 Cal.Rptr.2d 629, 70 P.3d 1046]. The evidence established that Fitzgerald's cases typically resolved at a level between 75% and 80% of his experts' appraisal. The Court finds, however, that the instant case would have been 'less valuable' because of Mr. Filbin's conduct and history with the County of San Luis Obispo, and finds that but for the breaches of the standard of care by Fitzgerald, the case would have settled for 70% of Gilman's $4,535,000.00 appraisal, or $3,174,500.00. For the purpose of trial, however, the Court accepts Gilman's $4,535,000.00 appraisal and has not considered the subsequent appraisals of Gilman ($6,800,000.00) and the Filbins' expert in this case, Tom Diamond ($7,100,000.00) at higher value as a result of their consideration of probability of rezoning. In addition, this Court has not found it necessary to reach and determine the issue whether or not there was a reasonable probability of rezoning of the Filbin parcel and whether such probability of rezoning would have increased the value of the Filbin parcel.

"But for the breaches of the standard of care by Fitzgerald, Plaintiffs would have settled their case for the sum of $3,174,500. Reduced by the settlement amount of $2,600,000.00, the Court finds Plaintiffs are entitled to damages on their Complaint against Defendant, Fitzgerald, in the amount of $574,000.00."

The court also entered a separate judgment on Fitzgerald's cross-complaint in which the court incorporated a prior order adjudicating Fitzgerald's claim for attorney fees and costs, as follows: "Fitzgerald's cross-complaint for attorney's fees and costs is not barred by his withdrawal but needs to be considered in light of the ruling above [(a reference to the judgment for the. Filbins)]. Further, the evidence as to attorney's fees is based on a reconstruction of attorney time estimated by Fitzgerald years after many of the events. On the other hand, it is clear that Fitzgerald spent considerable time and money during his representation of the Filbins. The Court finds that Fitzgerald, in Exhibit CC-1, has proven with sufficient specificity the expenditure of $42,542.69 and awards him reimbursement of those costs. As to a claim for attorney's fees based on a reasonable value of services, some exercise of discretion is necessary. The Filbins challenged Fitzgerald's time calculations based on a lack of actual records and an after-the-fact recreation of time sheets; further, those services were devalued to some extent by Fitzgerald's mistakes, which caused the case to be settled below value as described above. Fitzgerald has estimated, in Exhibit CC-1, the expenditure of 1088 hours of attorney time prior to withdrawal. Considering his services, but also considering the lack of records and the effect of his mistaken advice, the Court considers payment to Fitzgerald of 500 hours, or approximately one-half, at $400/hour as an appropriate fee of $200,000."

Judgment was entered for Fitzgerald on his cross-complaint in the amount of $242,542.69, and the Filbins appealed from that judgment. Fitzgerald appealed from the judgment awarding the Filbins $574,000 on the complaint.

## REVIEW

### Fitzgerald's Appeal

### The Legal Framework

■ "The failure to provide competent representation in a civil or criminal case may be the basis for civil liability under a theory of professional negligence. In a legal malpractice action arising from a civil proceeding, the elements are (1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence." (*Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1199 [108 Cal.Rptr.2d 471, 25 P.3d 670].)

Concerning the third and fourth of these elements, our Supreme Court cautioned: "If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort. [Citation.] The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence." (*Budd v. Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433]; cf. *Hecht, Solberg, Robinson, Goldberg & Bagley LLP v. Superior Court* (2006) 137 Cal.App.4th 579, 591 [40 Cal.Rptr.3d 446] ["In the legal malpractice context, the elements of causation and damage are particularly closely linked."]; 4 Mallen & Smith, Legal Malpractice (2012 ed.) § 37:15, p. 1509 ["Causation connects the element of fault to the fact of injury. . . . [T]he question may be whether the claimed damage was caused by the alleged wrongful conduct. The opposite perspective is whether the alleged misconduct . . . caused legally cognizable damage."].)

■ From this caution has come the principle that "Damage to be subject to a proper award must be such as follows the act complained of *as a legal certainty* . . . ." (*Agnew v. Parks* (1959) 172 Cal.App.2d 756, 768 [343 P.2d 118],[8] italics added, quoted in *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1048 [135 Cal.Rptr.2d 46, 69 P.3d 965];

---

[8] *Agnew* involved *medical* malpractice, but its use of the "as a legal certainty" language taken from *McQuilkin v. Postal Tel. Cable Co.* (1915) 27 Cal.App. 698, 701 [151 P. 21], has subsequently spread to legal malpractice, and not just the "settle and sue" context.

*Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1512 [85 Cal.Rptr.3d 268]; *Slovensky v. Friedman, supra,* 142 Cal.App.4th 1518, 1528; *Barnard v. Langer* (2003) 109 Cal.App.4th 1453, 1461–1462 [1 Cal.Rptr.3d 175]; *Marshak v. Ballesteros, supra,* 72 Cal.App.4th 1514, 1518; *Thompson v. Halvonik* (1995) 36 Cal.App.4th 657, 663 [43 Cal.Rptr.2d 142].)[9] Conversely, " ' "[t]he mere probability that a certain event would have happened, upon which a claim for damages is predicated, will not support the claim or furnish the foundation of an action for such damages." ' " (*Marshak v. Ballesteros, supra,* at p. 1518.)

■ To prevail in a legal malpractice action, "[s]imply showing the attorney erred is not enough." (*Orrick Herrington & Sutcliffe v. Superior Court* (2003) 107 Cal.App.4th 1052, 1057 [132 Cal.Rptr.2d 658].) The plaintiff must also establish that, but for the alleged malpractice, settlement of the underlying lawsuit would have resulted in a better outcome. (*Viner v. Sweet, supra,* 30 Cal.4th 1232, 1244; *Blanks v. Seyfarth Shaw LLP* (2009) 171 Cal.App.4th 336, 357 [89 Cal.Rptr.3d 710]; *Lazy Acres Market, Inc. v. Tseng* (2007) 152 Cal.App.4th 1431, 1436 [62 Cal.Rptr.3d 378]; *Orrick Herrington & Sutcliffe v. Superior Court, supra,* at p. 1057; *Marshak v. Ballesteros, supra,* 72 Cal.App.4th 1514, 1518; *Hinshaw, Winkler, Draa, Marsh & Still v. Superior Court* (1996) 51 Cal.App.4th 233, 239 [58 Cal.Rptr.2d 791]; *Thompson v. Halvonik, supra,* 36 Cal.App.4th 657, 663; *Campbell v. Magana* (1960) 184 Cal.App.2d 751, 754 [8 Cal.Rptr. 32].) "Thus, a plaintiff who alleges an inadequate settlement in the underlying action must prove that, if not for the malpractice, she would *certainly* have received more money in settlement or at trial." (*Slovensky v. Friedman, supra,* 142 Cal.App.4th 1518, 1528, italics added.)

The requirement that a plaintiff need prove damages to "a legal certainty" is difficult to meet in any case. It is particularly so in "settle and sue" cases, as the discussion in *Barnard v. Langer, supra,* 109 Cal.App.4th 1453 illustrates. There, affirming a nonsuit (and awarding defendants sanctions for a frivolous appeal), the court observed as follows: "The hindsight vulnerability of lawyers is particularly acute when the challenge is to the attorney's competence in settling the underlying case. As a leading legal malpractice text observes, the amount of a compromise is often 'an educated guess of the amount that can be recovered at trial and what the opponent was willing to pay or accept. Even skillful and experienced negotiators do not know whether they received the maximum settlement or paid out the minimum acceptable.

---

[9] According to the leading treatise: "The rule is that an attorney is not liable for a damage claim that is remote or speculative. A related, but different issue, is whether the causal relationship between the alleged error and damages is speculative. The test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount but concerns the more basic question of whether there are any damages . . . ." (3 Mallen & Smith, Legal Malpractice, *supra,* § 21:3, pp. 10–11, fns. omitted.)

Thus, the goal of a lawyer is to achieve a "reasonable" settlement, a concept that involves a wide spectrum of considerations and broad discretion. [¶] Theoretically, any settlement could be challenged as inadequate, and the resolution is likely to require a trial. . . . [¶] . . . [¶] A claim regarding an inadequate settlement often fails because it is inherently speculative. Negligence cannot be predicated on speculation that the attorney or another attorney could have secured a more advantageous settlement or the fortuitous event that a jury instead of a judge may have returned a higher award. A client, who was a plaintiff, must establish not only that concluding such a settlement fell outside the standard of care, but also what would have been a reasonable settlement and that such sums would have been agreed to and could have and would have been paid.' (4 Mallen, Legal Malpractice (5th ed. 2000) Error - Settlement, § 30.41, pp. 582–585, fns. omitted, citing *Thompson v. Halvonik, supra*, 36 Cal.App.4th 657, and *Marshak v. Ballesteros, supra*, 72 Cal.App.4th 1514.) As the same text notes, the speculative nature of hindsight challenges to recommended settlements 'often are protected as judgment calls. In evaluating and recommending a settlement, the attorney has broad discretion and is not liable for a mere error of judgment. The standard should be whether the settlement is within the realm of reasonable conclusions, not whether the client could have received more or paid less. No lawyer has the ability to obtain for each client the best possible compromise but only a reasonable one.' (4 Mallen, at p. 588, fns. omitted.)" (*Barnard v. Langer, supra*, 109 Cal.App.4th 1453, 1462–1463, fn. 13.) This language from *Barnard* has a particular resonance here, as the underlying action there was also an eminent domain action that settled.

*Marshak v. Ballesteros, supra*, 72 Cal.App.4th 1514, one of the cases cited in *Barnard*, was an action brought against the attorney who had represented the plaintiff when a marital dissolution action was settled. Affirming summary judgment for the attorney, the Court of Appeal stated: "In order to prevail in his legal malpractice action, plaintiff must prove that the dissolution action would have resulted in a better outcome had defendant recommended that he reject the settlement offer. *Plaintiff must prove what that better outcome would have been.*" (*Marshak v. Ballesteros, supra*, 72 Cal.App.4th 1514, 1518, italics added; accord, *Orrick Herrington & Sutcliffe v. Superior Court, supra*, 107 Cal.App.4th 1052, 1057.)

Building upon this logic, Fitzgerald goes right to the verge of soliciting a decision flatly prohibiting liability against former counsel for settlements. He presents a strong argument that the uncertainties and imponderables of settlement preclude a disgruntled former client from establishing causation and damages to "a legal certainty." As he puts it: "post hoc evaluations of what the outcome in an underlying case could have been had it not been settled are inherently speculative." And, he reasons, "Allowing a litigant to settle an underling case and then seek the difference between the settlement

and what they conceivably could have recovered in a best case scenario after trial would encourage the litigant to settle for whatever they could get and then seek the balance against their former attorney," which would undermine the public policy in favor of settlements.[10]

There is no occasion for us to examine a flat prohibition because our Supreme Court appears to have accepted the existence of settlement liability. (See *Viner v. Sweet, supra*, 30 Cal.4th 1232, 1242, citing *Marshak v. Ballesteros, supra*, 72 Cal.App.4th 1514, 1518–1519 and *Thompson v. Halvonik, supra*, 36 Cal.App.4th 657, 661–663.)

We nevertheless rule for Fitzgerald, concluding that the judgment against him cannot satisfy the necessary requirements because there is no substantial evidence of causation or damages.

### There Was No Evidence of Damages Proximately Caused by Fitzgerald

We begin our analysis by recalling the instances in which the trial court analyzed Fitzgerald's performance to determine whether they fell below the standard of care:

■ First is the matter of Fitzgerald advising the Filbins that they were "required" under section 1250.410 to submit a settlement demand 10 percent to 25 percent below Gilman's appraisal of value. The purpose of that statute is, like section 998, to facilitate settlement. (E.g., *Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 366 [48 Cal.Rptr.3d 875]; *Santa Clara Valley Water Dist. v. Gross* (1988) 200 Cal.App.3d 1363, 1368 [246 Cal.Rptr. 580].) The statute aims to achieve that goal using a carrot-and-stick approach: the party whose offer is reasonable can be awarded costs and attorney fees from the party whose offer was unreasonable. (E.g., *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 721 [66 Cal.Rptr.2d 630, 941 P.2d 809].) Submitting a moderately reduced demand may be a sound and prudential tactic, but no authority known to us "requires" it. Indeed, Fitzgerald makes no effort in his brief to defend the validity of the

---

[10] Whatever the merits of an absolutist solution, only one court—Pennsylvania—has adopted a flat prohibition. (*Muhammad v. Strassburger* (1991) 526 Pa. 541 [587 A.2d 1346, 1349].) All other states which have considered Pennsylvania's stand have rejected it. (*Grayson v. Wofsey, Rosen, Kweskin* (1994) 231 Conn. 168 [646 A.2d 195]; *Thomas v. Bethea* (1998) 351 Md. 513 [718 A.2d 1187]; *Meyer v. Wagner* (1999) 429 Mass. 410 [709 N.E.2d 784]; *Baldridge v. Lacks* (Mo.Ct.App. 1994) 883 S.W.2d 947; *McWhirt v. Heavey* (1996) 250 Neb. 536 [550 N.W.2d 327]; *Malfabon v. Garcia* (1995) 111 Nev. 793 [898 P.2d 107]; *Ziegelheim v. Apollo* (1992) 128 N.J. 250 [607 A.2d 1298].)

representation he made to the Filbins. Thus, we see no infirmity with the trial court's finding on this point.

Next, there is the matter of the means of Fitzgerald's departure from the case. The trial court appears to have believed that a "written Substitution of Attorney form" under section 284 would have obviated the need of "Fitzgerald appearing before Judge Crandall on his Motion to Withdraw." The trial court's finding that "Mr. Fitzgerald was incorrect in that regard" we take to be a finding that Fitzgerald erroneously concluded that a formal motion seeking Judge Crandall's leave to withdraw was necessary. Assuming that both the Filbins and Fitzgerald were agreeable to Fitzgerald's departure, judicial approval was not necessary. (*Hock v. Superior Court* (1990) 221 Cal.App.3d 670, 673–674 [270 Cal.Rptr. 579].) However, the trial court did not conclude that Fitzgerald's failure to use this unilateral procedure fell below the standard of care.

Finally, there is the trial court's conclusion that "Judge Crandall accepted that incorrect statement of law as fact, and addressed Mr. Filbin in a manner which made it apparent that Judge Crandall believed Mr. Filbin sought to deviate from the requirements of law," and this "was also below the standard of care." These determinations must obviously be based on the court's reading of the in camera hearing Judge Crandall conducted on Fitzgerald's discharge. We have read the transcript of that hearing (see fn. 6, *ante*), and it does not support the trial court's conclusion. Nothing in it suggests, much less establishes, that Judge Crandall "accepted" Fitzgerald's "incorrect statement of law as fact, and addressed Mr. Filbin in a manner which made it apparent that Judge Crandall believed Mr. Filbin sought to deviate from the requirements of law." The sole points of Judge Crandall's comments at the hearing were to ascertain whether the attorney-client relationship had irretrievably ruptured, and to impress upon Mr. Filbin that if Fitzgerald were discharged there would be no continuance. At no point during the hearing did Judge Crandall indicate that he "accepted" Fitzgerald's interpretation of section 1250.410. On the contrary, Judge Crandall expressly told Mr. Filbin: "I have no idea whether the demand or the final offer that's been made is even in accordance with law, and I don't know what's going to happen to that."

These acts or omissions, whether individually or collectively, do not establish actionable malpractice that caused the Filbins actual damage—let alone to "a legal certainty." At best, they constitute what Cardozo famously characterized as " 'negligence in the air' " (*Palsgraf v. Long Island Railroad Co.* (1928) 248 N.Y. 339, 341 [162 N.E. 99]), making the same point as California courts when noting that attorney breaches of the standard of care

are not per se actionable. (*Budd v. Nixen, supra*, 6 Cal.3d 195, 200; *Orrick Herrington & Sutcliffe v. Superior Court, supra*, 107 Cal.App.4th 1052, 1057.)

The ostensibly adverse findings of the trial court are neutralized by its discussion of why the Filbins failed to establish that Fitzgerald breached his fiduciary duty. Concerning Fitzgerald's termination, it must be remembered that the in camera hearing before Judge Crandall occurred only 17 days before the scheduled trial date. Even a consensual substitution that would not have required Judge Crandall's approval would almost certainly have required some explanation, particularly in light of the impending trial date. (See generally Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶ 9:385.2, p. 9(I)-150 (rev. # 1, 2010).) Thus, given the timing, the trial court sensibly reasoned that "Judge Crandall would have wanted information to justify terminating the attorney-client relationship on the eve of trial." As to what Fitzgerald may have told Judge Crandall at that hearing, the court below stated its belief that "a judge is . . . presumably able to accept negative information about a litigant without becoming biased."[11] The same detachment would obviously prevent Judge Crandall from being uncritically credulous of any statutory interpretation urged by Fitzgerald. (See *People v. Lashley* (1991) 1 Cal.App.4th 938, 952 [2 Cal.Rptr.2d 629] [trial judge presumed able to disregard improper argument by counsel].) Finally, there is nothing in the record suggesting that Fitzgerald's "misstatement" of the law was intended to deceive either the Filbins or Judge Crandall, or that it actually did so. (Cf. Rules Prof. Conduct, rule 5-200; *Batt v. City and County of San Francisco* (2007) 155 Cal.App.4th 65, 82–83, fn. 9 [65 Cal.Rptr.3d 716].)

More crucially, nothing Fitzgerald did, or failed to do, up to the time he departed as the Filbins' counsel caused the Filbins to do anything to their detriment. Fitzgerald's misstating the import of section 1250.410 did not persuade the Filbins to follow his advice about the amount of their demand to the County. Indeed, their refusal to follow Fitzgerald's advice was the basis on which the attorney-client relationship foundered. The Filbins stuck to their guns and refused to lower their demand below the amount of Gilman's appraisal—to the point that they raised their demand. Thereafter, they secured new counsel and a continuance of the trial date. And, it must be kept in mind, the court found that "Fitzgerald's conduct prior to his discussion with the Filbins regarding the pretrial demands and offers addressed by CCP

[11] Although the Filbins do not go so far as to accuse Judge Crandall of even unconscious bias, they do drop the suggestion that "once Fitzgerald effectively branded the Filbins as . . . unreasonable," Judge Crandall would view the Filbins "with a jaundiced eye." Not only is this suggestion the purest speculation, it is refuted by Judge Crandall's change of heart regarding granting the Filbins a continuance.

§ 1250.410 complied with the [required] standard of care." In other words, no part of Fitzgerald's strategy or tactical decisions prior to his discussion with the Filbins on July 31, 2007, can figure in the determination of whether Fitzgerald committed malpractice.

Therefore, when replacement counsel took over the case on August 3, it was with no lingering impairment at Fitzgerald's hands. When it came time for the Filbins to consider whether to settle the case some two and a half months later, in mid-October, they were free agents. No past decision by Fitzgerald hobbled them. Nothing prevented their new counsel from giving them impartial advice. No one would stop them from going to trial. Their decision to settle was theirs and theirs alone, made with the assistance of new counsel, with no input from Fitzgerald. The consequences of that decision are likewise theirs alone.

It is supremely ironic that, having fired Fitzgerald, the Filbins attempt to use his history of success in condemnation cases against him by positing that history as establishing not only the likelihood of a higher settlement but also the amount, this based on the appraisal made by the appraiser that Fitzgerald had selected. Plainly, for the Filbins, the best weapon against Fitzgerald is Fitzgerald himself.[12] There is nothing in the record which proves either that the County would have paid a dollar more than it did, or why the Filbins' new counsel did not secure the higher settlement the Filbins implicitly assume they would have pocketed had Fitzgerald remained as their counsel. Thus, and dispositively, the Filbins introduced no evidence that a greater settlement could have been negotiated from the County.[13] (See *Lazy Acres*

---

[12] A point certainly not lost on Fitzgerald. He notes in his brief that implicit in the trial court's reasoning "is that the Filbins' new counsel who took over the case from Mr. Fitzgerald (and who were the attorneys who tried the legal malpractice case) were significantly less effective than Fitzgerald. According to [one of the Filbins' experts], Fitzgerald would have been able to resolve the case for more than the Filbins' new counsel were able to. Especially in light of the trial court's finding that Fitzgerald did not breach the standard of care in any respect in his development of the case, the only reasonable conclusion to be derived from [this expert's] testimony, is that, based on the exact same evidence, the Filbins' new counsel's negotiating abilities were significantly inferior to those of Fitzgerald. It is, in essence, a tribute to Fitzgerald's abilities." At another point in his brief, Fitzgerald argues that the trial court's "task was to determine what 'should have happened' had Fitzgerald not been negligent. Clearly what 'should have happened' was that the Filbins' successor counsel should have settled the case for what Fitzgerald purportedly would have, especially given that the court found that the case was developed within the standard of care (meaning the [original] Gilman appraisal was acceptable)." These observations certainly seem to be within the realm of fair comment.

[13] In an unsuccessful attempt to have the Filbins' claims resolved on summary judgment, Fitzgerald submitted a declaration by Andrew Rauch, the attorney who represented the County in the condemnation action. The gist of the declaration was that the only reason he recommended the County agree to the $2.6 million settlement was because Fitzgerald "prepared the underlying case as he did on behalf of the Filbins." Conversely, "the attorneys

*Market, Inc. v. Tseng, supra,* 152 Cal.App.4th 1431, 1437–1438; *Orrick Herrington & Sutcliffe v. Superior Court, supra,* 107 Cal.App.4th 1052, 1058.)

■ In these circumstances, we conclude that there was no causal nexus between Fitzgerald's representation and the Filbins' subsequent decision to settle. Put another way, whatever Fitzgerald may have done or failed to do, the Filbins presented no evidence showing to a legal certainty that those acts or omissions proximately caused any injury. There is certainly no basis for believing that a greater settlement was lost. (*Viner v. Sweet, supra,* 30 Cal.4th 1232, 1244; *Barnard v. Langer, supra,* 109 Cal.App.4th 1453, 1462; *Marshak v. Ballesteros, supra,* 72 Cal.App.4th 1514, 1518–1519.)

■ Where the evidence is not in dispute, or permits of only one conclusion, "the determination of proximate cause becomes a question of law." (*Sabella v. Wisler* (1963) 59 Cal.2d 21, 32 [27 Cal.Rptr. 689, 377 P.2d 889]; accord, *Slovensky v. Friedman, supra,* 142 Cal.App.4th 1518, 1528; *Capolungo v. Bondi* (1986) 179 Cal.App.3d 346, 354 [224 Cal.Rptr. 326]; *Whinery v. Southern Pac. Co.* (1970) 6 Cal.App.3d 126, 128 [85 Cal.Rptr. 649].) Here, the Filbins "have had their day in court, assumedly having marshalled the best case they" could (*Estate of Swetmann* (2000) 85 Cal.App.4th 807, 822 [102 Cal.Rptr.2d 457]), with all their evidence in the record. And the only conclusion to be drawn from that evidence is that the Filbins cannot establish either causation or damages. "Under these circumstances, it is proper for us to direct that judgment be entered in favor of the defendant to avoid any additional expense." (*Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1220 [11 Cal.Rptr.2d 918]; accord, *Burtis v. Universal Pictures Co., Inc.* (1953) 40 Cal.2d 823, 835 [256 P.2d 933].) And that we do, ordering entry of judgment in favor of Fitzgerald.

### The Filbins' Appeal

As previously mentioned, the Filbins appealed from the judgment on Fitzgerald's cross-complaint; they did not appeal from the separate judgment on their complaint. In their opening brief, they do not challenge the judgment on the cross-complaint as either an abuse of the trial court's broad discretion (see *Leaf v. City of San Mateo* (1984) 150 Cal.App.3d 1184, 1189–1190, fn. 6

who replaced Mr. Fitzgerald . . . did not contribute anything to the underlying case that would have caused me to recommend a settlement . . . in excess of the $2,600,000 the underlying case ultimately settled for." Moreover, he would not have recommended increasing the County's settlement offer even if Judge Crandall had been willing to allow the Filbins to use Gilman's revised $6.8 million appraisal. Although Mr. Rauch testified at the trial, his testimony did not cover this subject, and was notable—or relevant to this appeal—only for his opinion that "Mr. Fitzgerald did an excellent job" for the Filbins.

[198 Cal.Rptr. 447]), or as a matter of miscalculating dollars and cents. Instead, they attempt to argue the soundness of the trial court's determination that they failed to establish that Fitzgerald breached his fiduciary duty to the Filbins, which determination was made in the judgment on the complaint, from which no appeal was taken. Settled law holds that the Filbins' attempt need not be considered.

■ " '[W]here several judgments and/or orders occurring close in time are separately appealable (e.g., judgment and order awarding attorney fees), each appealable judgment and order must be expressly specified—in either a single notice of appeal or multiple notices of appeal—in order to be reviewable on appeal.' " (*DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, 43 [99 Cal.Rptr.2d 366]; accord, *Colony Hill v. Ghamaty* (2006) 143 Cal.App.4th 1156, 1171 [50 Cal.Rptr.3d 247].) The policy of liberally construing a notice of appeal in favor of its sufficiency (Cal. Rules of Court, rule 8.100(a)(2)) does not apply if the notice is so specific it cannot be read as reaching a judgment or order not mentioned at all. (*Glassco v. El Sereno Country Club, Inc.* (1932) 217 Cal. 90, 92 [17 P.2d 703]; *Sears, Roebuck & Co. v. National Union Fire Ins. Co. of Pittsburgh* (2005) 131 Cal.App.4th 1342, 1352 [32 Cal.Rptr.3d 717].)

Section 906 will not assist the Filbins. That statute provides in pertinent part: "The respondent, or party in whose favor the judgment was given, may, without appealing from such judgment, request the reviewing court to and it may review any of the foregoing matters [(i.e., the verdict or decision and any intermediate ruling, proceeding, order or decision)] for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he [(the appellant)] relies for reversal or modification of the judgment from which the appeal is taken. *The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken.*" (Italics added.)

The Filbins are not raising the fiduciary duty issue in the defensive manner allowed by the statute; that is, they are not arguing that any error in the fiduciary duty finding may be used to neutralize other error pointed out by Fitzgerald. No, they are quite open in seeking the overturn of the separate judgment on Fitzgerald's cross-complaint, their opening brief requesting "this Court to reverse the lower court's Judgment in favor of Cross-Complainant Fitzgerald and to direct the entry of a new Judgment in favor of the Filbins which properly denies Fitzgerald any award of attorneys' fees and costs." That relief is foreclosed to them by the italicized portion of the statute quoted above.

■ In any event, the Filbins' argument would fail on its merits. "The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 [124 Cal.Rptr.3d 256, 250 P.3d 1115].) Here, as noted, the trial court's statement of decision included the following: "Although Plaintiffs allege a breach of fiduciary duty by Fitzgerald resulting from negative comments about his client unnecessarily made to Judge Crandall, the Court believes that Judge Crandall would have wanted information to justify terminating the attorney-client relationship on the eve of trial. In addition, the Court finds that Plaintiffs' ethics expert, Carol Langford, Esq., was unpersuasive based upon limited qualifications. The Court believes that a judge is, in addition, presumably able to accept negative information about a litigant without becoming biased. The Court, however, does not reach this issue factually, and did not formulate an opinion whether or not Judge Crandall became biased against the Filbins as a result of the disclosures made by Fitzgerald during the Motion to Withdraw. Plaintiffs' claim for breach of fiduciary duty is denied."

Faced with that, the Filbins argue that the record here demonstrates that Fitzgerald breached his duties as a matter of law. Their argument is as follows: "the facts as the trial court found them to be here clearly demonstrate that Fitzgerald's conduct not only fell below the applicable standard of care, but also constituted a fiduciary breach *as a matter of law*. First, as mentioned above, Fitzgerald alone created the phantom 'conflict' with the Filbins by insisting they were compelled by law to make a settlement demand they were never required to make. (See 7 CT 1737 [(where the trial court finds that Fitzgerald's misstatement of the law 'on a point of major importance' to the Filbins precipitated 'a breakdown in the attorney-client relationship, eventually resulting in the hearing before Judge Crandall on Fitzgerald's Motion to Withdraw')].) Second, by then erroneously informing the underlying trial judge that the Filbins refused to follow the applicable law (that is, that they refused to make an offer of settlement they were *not* required to make) as a basis for Fitzgerald's withdrawal request, Fitzgerald unequivocally put his own interests before his clients' so he could justify abandoning them on the eve of trial. Not only were Fitzgerald's representations to the court false, they were also improper in that they had the very impact Fitzgerald intended: to influence the court to grant Fitzgerald's withdrawal motion by making the Filbins look so unreasonable and greedy in the court's perception that a withdrawal (even at that late stage of the litigation) would be justifiable. *And that is precisely what happened.* [Citation.] That this is

what Fitzgerald intended—to make whatever disclosures he believed were necessary to convince Judge Crandall that the Filbins were acting unreasonably and unlawfully—cannot be disputed on this record."

As we read the argument in the Filbins' brief, including that quoted above, its essence is that a violation of fiduciary duty appears as a matter of law because (1) Fitzgerald made some disclosure(s), supposedly of some client confidence(s), to Judge Crandall and (2) the disclosure(s) resulted in bias against the Filbins. We easily reject the argument, for several reasons.

First, the argument ignores that the trial court specifically found that it "did not formulate an opinion whether or not Judge Crandall became biased against the Filbins as a result of the disclosures made by Fitzgerald."

Second, the Filbins' argument is premised on a treatment of the record that is less than candid. The argument asserts what Fitzgerald did, so improperly they contend, was "as a basis for [his] withdrawal request [and] unequivocally put his own interest before his clients' so he could justify abandoning them on the eve of trial." To talk of "withdrawal" and "abandon[ment]" is to ignore any objective reading of the transcript of the *in camera* hearing, which hearing began as follows: "Judge Crandall: This is in the matter of the *discharge* of counsel that apparently occurred on July 31. So, Mr. Fitzgerald, can you give me some more information about it? What I'm trying to make sure of is that, that its, we, I want to make sure also Mr. Filbin knows what he is doing and that it is going to require him going forward on the 20th one way or the other. I guess that is my main thing. So let me ask Mr. Filbin. Mr. Filbin, *you've terminated Mr. Fitzgerald* and can you give me some idea as to why?" (Italics added.)

Third, review of the transcript shows nothing indicating that Fitzgerald revealed any confidences. And nothing indicating that Judge Crandall indicated any bias against the Filbins.

Fourth, the Filbins' "as a matter of law" argument is premised on inferences they contend must be drawn in their favor. The law, of course, is otherwise, that all inferences must be drawn in favor of the judgment. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].)

## DISPOSITION

The judgment on the complaint is reversed, and the cause is remanded to the trial court to enter judgment in favor of Fitzgerald. The judgment on the cross-complaint is affirmed. Fitzgerald shall recover his costs on both appeals.

Kline, P. J., and Haerle, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied March 13, 2013, S207701.