Filed 6/21/16  Kley v. Gwilliam CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| VICTOR KLEY, et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>JOHN GARY GWILLIAM, et al.,<br><br>        Defendants and Respondents. | A143943<br><br>(Alameda County<br>Super. Ct. No. RG11555905) |

The three appellants are Victor Kley, an inventor, and General Nanotechnology, LLC (GN), and Metadigm, LL (Metadigm), companies of which Kley was a principal. Beginning in 2004, Kley entered into communications with Lawrence Livermore National Laboratory (LLNL) in connection with a process to develop alternative energy, communications that proceeded to the point where a nondisclosure agreement was signed.  The communications ended in 2004, when LLNL said any development was not within its budget.

In 2008, appellants filed suit against LLNL alleging various tort and contract claims based on claimed misappropriation (the trade secrets case).  LLNL's answer alleged among other things that the suit was barred by the statute of limitations. Following Kley's testimony at deposition, LLNL wrote a letter demanding that some of the claims be dismissed because they were time barred, and if they were not, LLNL would move for summary adjudication and thereafter seek attorney fees.  Appellants did not respond to the letter, and LLNL obtained such summary adjudication.  The remaining claims were rejected by a jury, following which LLNL obtained $189,565.50 in attorney

1

fees and $121,706.49 in costs, costs appellants did not seek to tax. Appellants appealed, and Division Five of this court affirmed. (*General Nanotechnology LLC v. Lawrence Livermore National Security LLC* (June 27, 2012, A129016/A129428) [nonpub. opn.].)

Appellants sued two sets of lawyers who had represented them in the trade secrets case, focusing primarily on the lawyers' conduct in connection with the demand letter and the nonfiling of a motion to tax costs. The lawyers separately filed motions for summary judgment. Following extensive initial briefing, supplemental briefing, the allowance of a supplemental expert's declaration on behalf of appellants, and three hearings, the trial court issued a comprehensive order granting summary judgment. We affirm.

## BACKGROUND

### Appellants' Relations with LLNL

This 12-year-old saga has its genesis in inertial confinement fusion (ICF). ICF is a process involving the use of lasers to raise the temperature of hydrogen isotope fuel contained in very small target capsules to extremely high temperatures, in order to produce energy from nuclear fusion. One aspect of the ICF program is research and development of the very small target capsules—about 2000 microns in diameter—that contain the fuel for ICF experiments.[1]

LLNL had been doing research into ICF, with Dr. Robert Cook leading the group that developed the target capsules. Kley became increasingly interested in the field, and began collaborating with the group at LLNL. In Kley's own words, this was the story of that collaboration—and its demise:

"In the spring of 2004, General Nanotechnology, LLC ('GN') and Metadigm, LLC, ('Metadigm'), two companies of which I was a principal, entered into discussions

_____

[1] Some of the background facts are taken from the opinion of Division Five in *General Nanotechnology LLC v. Lawrence Livermore National Security LLC*, *supra*, of which we take judicial notice. (Evid. Code, § 452, subd. (d); *Taliaferro v. Taliaferro* (1960) 178 Cal.App.2d 140, 141.)

2

with [LLNL] regarding a possible joint development of 'diamond ICF shell' technology I had invented.

"3.   On March 15, 2004, LLNL signed a non-disclosure agreement (the 'NDA').

"4.   In May, 2004, I was informed by LLNL that GN and Metadigm would be awarded a contract to produce diamond ICF shells for LLNL once the formalities were worked out.  GN and Metadigm thereupon set up a Delaware corporation called DiaMEMS—now defunct—to do the work.

"5.   On September 7, 2004, DiaMEMS submitted a proposal to LLNL detailing the major steps required to produce the diamond ICF shells for LLNL.

"6.   On October 13, 2004, contract negotiations ended when Robert Cook of LLNL informed Kley by telephone that pursuing diamond ICF shells was not in LLNL's current budget.

"7.   On October 14 and 15, 2004, I had an exchange of e-mails with Robert Cook in which Cook stated that he could 'not say that no-one at LLNL or elsewhere will pursue diamond deposition technologies aimed at ICF shells' and in which I accused LLNL of having misled GN and Metadigm about its intentions.

"8.   On or about November 12, 2004, I met with an entity called General Atomics and came into possession of a 'view graph' provided to General Atomics by LLNL and indicating that as of October 14, 2004—*i.e.*, after Cook had told me that pursuing diamond ICF shells was not in LLNL's budget—LLNL was planning on developing diamond shells over the next several years.  DiaMEMS, Inc. and General Atomics entered into a nondisclosure agreement at that time.

"9.   On November 16, 2005, I wrote a letter to Joe Kilkenny of General Atomics stating that 'as we made clear to Mike Campbell when we first executed the NDA between our respective companies [*i.e.*, on or around November 12, 2004] . . . .  LLNL is a party to our NDA and revealed information to you, and perhaps others, in conflict with the requirements of the NDA they signed."

**Kley's Search for a Lawyer**

Apparently concerned that LLNL was violating the NDA and using his proprietary information without authorization or compensation, Kley began to search for a lawyer. The details of that search are not in the record, but it apparently began in 2007. The record here does show that Kley contacted no fewer than 40 lawyers and firms, all of whom refused the representation, some citing conflicts with the University of California and most refusing to take the case on a contingency basis.

One other fact in the record is that among the firms contacted was Gwilliam, Ivary, Chiosso, Cavalli and Brewer (the Gwilliam firm), which Kley contacted by telephone in July 2007, and the details of which will be discussed below. Suffice to say here the Gwilliam firm did not undertake an investigation of the facts, did not advise Kley about them, and did not make a referral. In short, the Gwilliam firm—apparently like some 40 other attorneys or firms—declined an unsolicited telephone intake.

Kley was ultimately successful in securing counsel, in early 2008, when Thomas Lester Wallace (Wallace) at Imperium Patent Works, LLP (Imperium) agreed to take the case.

**The Trade Secrets Case**

On April 29, 2008, the Imperium firm filed the trade secrets case against LLNL, in a complaint that alleged claims for misappropriation of trade secrets, breach of written contract, breach of the implied covenant of good faith, and fraud. Kley reviewed and approved the allegations in the complaint. As pertinent here, the complaint alleged that "Prior to July 2007, neither GN nor Mr. Kley was aware of any breach of the NDA by LLNL . . . or any party." The basis of this allegation was Kley's advice to Wallace that he, Kley, learned about the disclosure of the trade secrets in "the summer of 07."

Following LLNL's demurrer, Kley approved for filing a first amended complaint. Again, Kley and Wallace discussed the timing of Kley's claimed discovery of the misappropriation. Again, Kley confirmed every line in the amended complaint, including that he discovered his claims in 2007.

4

In spring 2009, Kley's deposition was taken in the trade secrets case. Among other things, he was asked about an October, 2004 e-mail exchange with Dr. Cook. He was then shown the e-mail from Dr. Cook, and asked if he contended that anything in it was false. This was Kley's testimony:

"A: It's a lie?

"Q: Why is that?

"A: Because he knew the truth?

"Q: What was the truth?

"A: The truth is that they were already working on it.

"Q: And when did you suspect that that was the case?

"A: I suspected from this email and the one before that I was dealing with someone who wasn't honest, who had misrepresented it all along the way. [¶] . . . [¶] Look, I'm telling you this smelled and looked and was a lie."

On July 21, 2009, LLNL's attorneys sent Wallace a letter demanding dismissal of the misappropriation and fraud claims (the July 21 letter). The July 21 letter quoted Kley's deposition testimony that he was suspicious of LLNL in October 2004 when he exchanged e-mails with Cook. And, the letter went on, "As you know, suspicion of a misappropriation is all that is needed to trigger the statute of limitations. [Citation.] Similarly, a potential fraud plaintiff need only suspect wrongdoing by another to start the clock of the statute of limitations. [Citation.] In this case, Plaintiffs' own documents and testimony show that Plaintiffs knew of its now-asserted misappropriation and fraud claims, and certainly suspected wrongdoing, triggering the statutes of limitations during the time period October 13 – November 12, 2004." Since the complaint was filed more than three years later, i.e., after the statutes of limitations on the claims had run, the claims were time-barred and had to be dismissed. The July 21 letter included the threat that if appellants refused to comply by July 25, 2009, LLNL would "move under California Code of Civil Procedure Section 128.7 for sanctions in the amount of [LLNL's] attorneys fees incurred in defending these causes of action to date."

5

Wallace sent the letter to Kley. And because Wallace was at that time in discussions with the Gwilliam firm about possibly substituting in as counsel, Wallace sent the letter to that firm as well.[2] There is little testimony as to what was said about the July 21 letter, as also discussed below. Suffice to say here that appellants did not respond to the letter and the claims remained.

On August 4, LLNL filed its motion for summary adjudication based on the statute of limitations. Opposition was filed on the appellants' behalf by the Gwilliam firm, which had substituted in as counsel on August 13, 2009. The thrust of the opposition was Kley's declaration where, among other things, he testified as follows:

"At the time that I wrote the October 15, 2004, email, I did not believe that LLNL had committed fraud or misappropriated my proprietary information. I was concerned about a future event and explained my belief that, if in the future LLNL were to go with diamond ICF shells, Metadigm and/or DiaMEMS would be entitled to compensation for the use of my invention."

As to appellants' November 2004 interaction with General Atomics, Kley declared that the LLNL timeline planner General Atomics provided him referred to the point in time at which appellants "could begin producing diamond ICF shells." Kley claimed that while he originally thought the document might be a violation of the NDA, he reviewed the contract and concluded it was not. In sum, Kley testified there were no facts of which he was aware or that he could have discovered prior to 2007 that would have alerted him to the acts alleged in the suit against LLNL. Moreover, Kley declared, in October 2004 he believed Dr. Cook's representations, and he reiterated that he first discovered his claims while attending the 2007 tradeshow.

---

[2] By the time of the July 21 letter, Wallace had told Kley that he had never done a trial before and needed assistance. They had been talking about the possibility of another attorney substituting (or perhaps associating) in, and by late June or early July, they had specifically discussed the possibility of the Gwilliam firm becoming involved as appellants' counsel.

Kley's declaration was unavailing, and the trial court entered a lengthy order granting summary adjudication. In relevant part, the order stated as follows:

"In light of Kley's deposition admissions that he knew or suspected the falsity of each of [the] alleged misrepresentations by October 2004, the Court finds that Kley's subsequently proffered declaration to the effect that he "did not believe that [LLNS] had committed fraud" or that he "believed, based on Dr. Cook's representations, that [LLNS] would not pursue diamond ICF shells" . . . do not give rise to a triable issue as to Kley's suspicion of the elements of his fraud cause of action against Cook by October 2004[.] [Citation.] [¶] As discussed above, it is not necessary that Kley know or have solid evidence of the falsity of the alleged misrepresentations, or to have actual knowledge of each of the remaining elements of a cause of action, for such cause of action to accrue. Instead, it is sufficient if the plaintiff has "reason to at least suspect that a type of wrongdoing has injured" him. [Citation.] Kley admitted in his deposition that he had a suspicion of wrongdoing as of October 2004 . . . . While not all harm arising therefrom may have been known at the time . . . [t]here is no dispute that at least some of such alleged harm and detrimental reliance occurred by the end of 2004." (*General Nanotechnology, supra,* at pp. 20–21.)

Appellants sought a writ from the summary adjudication order, which was summarily denied.

With the misappropriation and fraud claims out of the trade secrets case, the only claims left were breach of contract and breach of the implied covenant. Those claims proceeded to a jury trial in March 2010, with appellants represented by the Gwilliam firm. Following a 11-day trial, the jury returned a defense verdict, a verdict that, in Kley's words, was returned "within a few minutes." Judgment on the verdict was entered on May 5, 2010.

On May 20, the Gwilliam firm associated in Richard Antognini, with whom Kley signed a retainer agreement.

On May 25, LLNL filed a memorandum of costs, seeking $121,706.49 in costs.

7

On May 25, LLNL also filed the threatened motion for attorney fees, seeking over $2,000,000 in fees from GN and Metadigm. The Gwilliam firm filed opposition.

On August 12, the trial court granted in part LLNL's motion for fees and costs. On the attorney fee issue, the court concluded: " '[A]ppellants'] misappropriation claim was objectively specious and was maintained in bad faith after July 21, 2009. Leaving aside questions of the claim's ultimate validity, the Court finds that it was initiated at a point well past the running of the applicable limitations period. Moreover, it was doggedly maintained thereafter, despite Victor Kley's knowledge—as admitted in his deposition—of the existence of the elements of the claim well before the limitations period ran. On July 21, 2009, [LLNL] notified [appellants] that the misappropriation claim was completely time-barred and therefore procedurally invalid, spelling out the reasons therefore. . . . Although a plaintiff is not required simply to accept the arguments of a defendant, at this point it was manifestly clear, based on [appellants'] own admissions, that the misappropriation claim could not be maintained. [LLNL was] forced to prosecute the motion for summary adjudication nonetheless and [is] entitled to be compensated for the fees incurred in doing so. . . . [¶] . . . [¶] [T]he Court concludes that a reasonable and appropriate award would be the fees incurred in prosecuting the motion for summary adjudication and opposing the Petition for Writ of Mandate after July 21, 2009.' " Accordingly, the trial court awarded LLNL $189,565.50 in attorney fees.

The order also awarded the $121,706.49 in costs claimed in the memorandum.

**Appellants File the First Lawsuit Against the Lawyers**

On January 13, 2011, while the appeal in the trade secrets case was pending, appellants filed their first lawsuit involved here, action No. RG11555905 (for consistency with the briefing, the main action). The main action was filed by attorney Elden Sellers, and named six defendants: Wallace and the Imperium firm (when referred to collectively, the Wallace defendants); the Gwilliam firm and J. Gary Gwilliam, a partner there (collectively, the Gwilliam defendants); and Richard Antognini and the Law Offices of Richard Antognini (collectively, the Antognini defendants). The main action alleged

8

three causes of action, each against all defendants: (1) professional negligence; (2) breach of contract; and (3) breach of fiduciary duty.

As will be seen, appellants ultimately dismissed the second and third causes of action. As pertinent to the one claim that was to remain, the claim for professional negligence, the complaint alleged as follows: "Defendants, and each of them, were negligent in carrying out their professional responsibilities and duties to plaintiffs in some or all of the following respects: Defendants negligently failed to fully and competently explain all the legal options available to plaintiffs, failed to provide plaintiffs with clear explanations of the procedural requirements involved in the litigation, including but not limited to the requirements for the designation of expert witnesses and statutes of limitations, as well as handling of UTSA claims; failed to meet with plaintiffs for the purpose of reviewing and explaining the documents they prepared, the requirements and the options available, and maintained the UTSA claims in 'bad faith' pursuant to California Civil Code Section 3426.4." As seen, there is no reference to the July 21 letter.

**Appellants File the Second Lawsuit**

On January 10, 2013, some two years after appellants sued the Gwilliam defendants in the main action, and after appellants were unsuccessful on their appeal, they sued the Gwilliam defendants again, in action No. RG13662914 (the consolidated action). The consolidated action was filed by different counsel, Joseph Wood of Hennefer Finley & Wood LLP, who also represents appellants here. The consolidated action named only the Gwilliam defendants and alleged two causes of action: (1) professional negligence and (2) breach of fiduciary duty (which latter claim was also ultimately dismissed).

The professional negligence claim alleged that when appellants consulted with the Gwilliam firm in August 2007, an "attorney client relationship was formed at that time . . . for the limited purpose of determining whether Gwilliam and the Gwilliam Firm would undertake litigation against [LLNL] on plaintiffs' behalf and, if it were determined that they would not do so, advising plaintiffs as to what immediate steps plaintiffs should

9

take in order to protect the viability of plaintiffs' claims against [LLNL]. Such advice necessarily included alerting plaintiffs to any statutes of limitations to which those claims might be subject and advising plaintiffs to make sure that plaintiffs filed their claims prior to the running of such statutes."

Then, following boilerplate allegations of duty, the consolidated action alleged that: "12. Gwilliam and the Gwilliam Firm breached that duty by, among other things, negligently failing . . . to alert plaintiffs to any statutes of limitations to which those claims might be subject; (b) negligently failing to advise plaintiffs to make sure that plaintiffs filed their claims prior to the running of such statutes; and (c) in particular, negligently failing to advise plaintiffs that, in order to avoid any arguable statute of limitations defense that might be raised in connection with plaintiffs' claims against [LLNL], plaintiffs should file a complaint asserting those claims on or before October 1, 2007."

On January 22, 2013, the main action and the consolidated action were deemed related, and from then on treated together.

**Defendants Move for Summary Judgment**

In late February 2014, the Wallace defendants moved for summary adjudication of all three causes of action, and therefore summary judgment. The motion was set for May 20, 2014. The moving papers totaled 1224 pages, including an extensive request for judicial notice. Premising their motion on the allegations quoted above and their perception of what appellants contended in discovery was the basis of the claims against them, the Wallace defendants' position was that appellants could show no act or omission below the standard of care that proximately caused damage. Rather, facts independent of their conduct proximately caused the dismissal of appellants' misappropriation and fraud claims. The Wallace defendants also contended that the claims were lost after the Wallace defendants had substituted out as counsel, and, finally, that appellants could not have won their claims because they could not prove LLNL used or disclosed any proprietary information.

10

In early March, the Gwilliam defendants filed their motion for summary adjudication, also set for May 20. Their moving papers totaled 412 pages. Their fundamental argument, similar to that of the Wallace defendants, was that appellants could not prove that anything the Gwilliam defendants did, or did not do, caused damage. Put another way, appellants could not prove causation, an issue, the motion asserted, that may be " 'decided as a question of law if the undisputed facts permit only one reasonable conclusion. (*Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, 1528.)' " The Gwilliam defendants asserted that appellants' damage is not due to "any negligence by Defendants" and, they concluded, citing several Supreme Court cases: "The attorney is not liable for every mistake he may make in his practice; he is not, in the absence of an express agreement, an insurer of the soundness of his opinions . . . ."

On April 22, prior to the deadline for their oppositions, appellants filed two requests for dismissal, dismissing with prejudice the second and third causes of action in the main action and the second cause of action in the consolidated action. What was now left in the two cases were only the claims for professional negligence.

On May 7, appellants filed a separate memorandum in opposition to each motion. After confirming the dismissals noted above, each memorandum began with a brief description of appellants' claims against the respective defendants. Following those preliminaries, the memoranda were virtually identical, each of them containing a seven-page "statement of facts," followed by "Expert Testimony Presented by Plaintiffs," discussing the claimed expert testimony of attorney David Lerman. And both memoranda concluded with a brief argument that the motions be denied because appellants "Have put forward substantial evidence of [the respective defendants'] negligence and damage to [appellants] caused thereby." Appellants' memoranda cited two cases: *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 (*Aguilar*), and *Kirsch v. Duryea* (1978) 21 Cal.3d 303. Interestingly, appellants' memoranda did not contend that defendants failed to meet their initial burden.

Appellants' opposition also included several declarations including, as pertinent here, those of Kley and Mr. Lerman, testifying as a claimed expert witness.

11

Kley's declaration was four and one-half pages long and began with his description of his history with LLNL and the filing of the trade secrets case. His declaration then turned to his claims against the defendants, where Kley testified as follows, some of which testimony was apparently given for the first time, notwithstanding the extensive discovery that had been undertaken by defendants:

"10. On or about July 26, 2007, I contacted defendant Gwilliam, Ivary, Chiosso, Cavalli & Brewer (the 'Gwilliam firm') about a potential case against LLNL arising out of what I believed was LLNL's unauthorized use of the diamond ICF shell technology I had invented. I was at that time interviewed by telephone by a woman whom I believe to be Sonya Arellano, an intake clerk in the employ of the Gwilliam firm.

"11. Neither Ms. Arellano nor anyone else associated with the Gwilliam firm asked me to provide a copy of the contract, written communications, or any other documents, pertaining to my dealings with LLNL. [¶] . . . [¶]

"13. I am informed and believe that Steven Cavalli, an attorney with the Gwilliam firm, claims to have sent me a letter on or about October 22, 2007 stating that the Gwilliam firm would not take my case. I never received any such letter. I was, rather, informed by telephone—again, I believe, by Ms. Arellano—that the Gwilliam firm would not take the case.

"14. During and following my above-described interactions with the Gwilliam firm, I remained unaware that the statute of limitations on a claim for misappropriation of trade secrets was three years, extendable on the basis of certain kinds of 'non-discovery,' and that, in light of my interactions with Robert Cook and General Atomics in October and November, 2004, described above, that statute could plausibly be held to run as early as October 13, 2007 and even more plausibly be held to run on November 12, 2007. Had I been made aware of those facts by the Gwilliam firm, I would have immediately hired an attorney on an hourly basis to file that claim.

"15. In or about April, 2008, defendants Thomas Lester Wallace and Imperium Patent Works, LLP (collectively, 'Wallace') undertook to represent me and GN—and subsequently, Metadigm as well—in a suit against LLNL. The suit was filed on or about

12

April 29, as *General Nanotechnology, LLC, et al. v. Lawrence Livermore National Security, LLC, et al.*, Alameda County Superior Court No. VG 08 384523 (the 'Underlying Action').

"16. Wallace did not tell me, at or around that time, that he had never taken part in a jury trial and had participated in only two bench trials, both times as an associate assisting lead counsel. To the contrary, he represented himself as having 'won many cases.' If I had been aware of his lack of relevant experience, I would have terminated my relationship with Wallace and found another attorney.

"17. Wallace did not tell me, at any time, that he took on the case because he had never done a California state law case, that he simply 'wanted to do it,' and/or that that was one of the major reasons why he chose to take on what he regarded as a 'crappy' case. Nor did he ever tell me that one of his primary motivations was to get some jury trial experience, that he believed the case was not ever worth any money to him, or that he never believed the case was going to go anywhere. Had Wallace communicated those facts to me, I would have terminated the relationship with Wallace and found another attorney.

"18. Wallace filed both a complaint and a first amended complaint in the Underlying Action. At the time he was preparing the first amended complaint, we had brief discussions about the statute of limitations issue with reference to the claim for misappropriation of trade secrets. He expressed the opinion that as long as I honestly believed I had no firm basis for knowing that LLNL had misappropriated GN's and Metadigm's proprietary materials until sometime in 2007, there was nothing to worry about on that issue.

"19. In or about June or early July, 2009, the Gwilliam firm began consulting with Wallace and me about the case in anticipation of taking over as counsel."

Kley's declaration then referred to the July 21 letter from LLNL to Wallace, and said this:

"21. Wallace sent me a copy of the letter and I discussed it with Wallace and the Gwilliam firm. They both advised me orally that the letter was mere posturing by

LLNL's attorneys, that the trial court would almost certainly not grant summary adjudication on statute of limitations grounds, that GN and Metadigm should therefore not be concerned with the threat that they could be required to pay LLNL's attorney's fees, and that I should not be concerned with the threat that I could be required to pay LLNL's costs of suit. As a result of that advice, the claim for misappropriation of trade secrets was not dismissed.

"22. Had Wallace and/or the Gwilliam firm advised me that there existed a substantial possibility that the trial court would grant summary adjudication on statute of limitations grounds, and that GN and Metadigm would thereby be exposed to the substantial possibility of having to pay LLNL's attorney's fees, and that I would thereby be exposed to the substantial possibility of having to pay LLNL's costs of suit, I would have instructed Wallace and/or the Gwilliam firm to accept LLNL's proposal and dismiss the misappropriation of trade secrets claim and the fraud claim."

Finally, Kley's declaration concluded:

"25. On May 20, 2010, the Gwilliam firm associated in Richard Antognini to, as I understood it, work with the Gwilliam firm on post-trial motions. The Gwilliam firm remained of record as lead counsel in the case.

"26. On May 25, 2010, LLNL filed a memorandum of costs in the Underlying Action seeking more than $121,706.49 in costs, independent of fees, from all plaintiffs.

"27. The Gwilliam firm did not advise me that in order either to have the possibility of reducing that amount, or of having my portion thereof reduced on the grounds that I had not been in the case following summary adjudication of my claim for fraud, GN, Metadigm, and I would have to file a motion to tax costs within fifteen days. As a result, I remained unaware of those facts and no such motion was filed. Had I been aware of those facts, I would have insisted that an appropriate motion to tax and apportion costs be filed."

Mr. Lerman's declaration was 16 pages long, and described at length his background, experience, and the extensive material he had reviewed prior to his

14

declaration. He then testified at length as to his opinions, opinions supported in great part by Kley's declaration, as discussed in more detail below.

Both sets of defendants filed replies, both replies accompanied by extensive objections to evidence. The objections included that much of Kley's declaration was hearsay, lacked foundation, and was inadmissible due to prior inconsistent statements, based on *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 22. Defendants further objected that Mr. Lerman was not qualified as an expert and that his opinions lacked foundation, were speculative, and based upon matter that could not reasonably be relied upon, that is, Kley's declaration.

**The Proceedings on the Motions**

As noted, the motions were scheduled for May 20. However, on May 16, the judge to whom the case was assigned was recused, and three days later the case was reassigned to the Honorable Robert McGuiness. This caused the rescheduling of the motions several times, and the motions were first called on August 26. The motions were then continued to September 16, when, following hearing, Judge McGuiness allowed appellants to file an amended declaration of Mr. Lerman, an amended separate statement, and also supplemental briefs.

On October 1, appellants filed an amended declaration of Mr. Lerman. This declaration was 27 pages long, and among other things expanded the description of Mr. Lerman's litigation experience and further attempted to tie his expert opinions to his factual assumptions. The Wallace defendants filed evidentiary objections to the amended declaration and a supplemental brief explaining why the amendment failed to resolve the problems with Mr. Lerman's initial declaration.

The motions came on again on October 28. Judge McGuiness heard extensive argument, at the conclusion of which he allowed the parties to file additional briefs addressing some cases discussed at the argument, which they did.

On November 10, Judge McGuiness entered his order granting summary judgment. The order was thorough indeed, and analyzed the facts involved in each motion separately, concluding that appellants' claims failed in several respects. The

order also addressed the defendants' separate objections to evidence, sustaining a few objections and overruling most of them.

On November 10, judgment was entered in favor of the Wallace defendants and the Gwilliam defendants. On January 8, 2015, appellants filed a request for dismissal of the Antognini defendants. With that, the case was ripe for appeal, and appellants filed their appeal that same day.

## DISCUSSION

### Introduction and Some Preliminary Observations

We begin the discussion by noting that appellants' briefing here is atypical, if not unique. Appellants' opening brief, which is 86 pages long, begins its argument on page 38. Following brief reference to two standards of review, first for summary judgment and then for evidentiary rulings, the brief devotes the next 25 pages to Judge McGuiness's evidentiary rulings. Only after all that do appellants set forth their arguments, which are two. The first argument, consuming the next 15 pages, is that both sets of defendants failed to meet their burdens of production and thus summary judgment should have been denied "even in the absence of any evidence" by appellants. The second argument, the final four pages of the brief, is that even if defendants met their burden, appellants' evidence "created triable issues of material fact."

Appellants' 82-page reply brief is similar. It, too, devotes the majority of its discussion—49 pages—to evidentiary issues.

We have two observations.

First, Judge McGuiness denied all of the Wallace defendants' objections to evidence, except for two, numbers 11 and 12 to Mr. Lerman's declaration. As to the objections by the Gwilliam defendants, Judge McGuiness sustained only five of the many objections, to a total of 72 lines in Mr. Lerman's 27-page amended declaration. And as to the objections to Kley's declaration, Judge McGuiness ruled that "the Objections are all OVERRULED, however, the Court has disregarded the declaration to the extent that it contradicts the deposition testimony. (See *D'Amico v. Board of Medical Examiners*

16

(1974) 11 Cal.3d 1, 21-22.)" In light of that, we do not understand how appellants can allocate 74 pages of briefing to evidentiary issues.

That said, we understand that appellants take issue with some of Judge McGuiness's rulings, especially those dealing with the expert declaration of Mr. Lerman. The Supreme Court has not yet decided the standard by which we review such rulings (see *Reid v. Google, Inc.* (2010) 50 Cal.4th 512); and as we noted in *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255 (*Nazir*), that issue may present an interesting question. However, we went on, quoting the leading appellate commentary, " 'Pursuant to the weight of authority, appellate courts review a trial court's rulings on evidentiary objections in summary judgment proceedings for abuse of discretion. [Citations.]' (Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group (2008) ¶ 8.168, p. 8-130.)" (*Nazir*, *supra*, at p. 255, fn. 4.)

But regardless of what standard we use, we would conclude that Judge McGuiness's rulings were correct, when analyzed in light of his significant gatekeeper function in dealing with expert testimony, as mandated by *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 (*Sargon*), where a unanimous Supreme Court held that the trial court had acted properly in excluding speculative expert testimony. Citing numerous cases and authorities, the court discussed at length the obligations of the trial court, with observations that included these: "Thus, under Evidence Code section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion. As we recently explained, '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors. . . . [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?" [Citation.]' [Citations.]" (*Sargon, supra,* 55 Cal.4th at p. 770.)

In short, under Evidence Code section 801, subdivision (b), and section 802, "the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on

17

matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon, supra,* 55 Cal.4th at pp. 771–772.) The goal: "to exclude 'clearly invalid and unreliable' expert opinion." (*Id.* at p. 772.) As will be discussed in connection with the particular issue presented, Judge McGuiness committed no error.

Our second preliminary observation is that we have difficulty understanding appellants' argument—*made for the first time on appeal*—that defendants did not meet their initial burden. A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that [the defendant] is entitled to judgment as a matter of law." (*Aguilar, supra,* 25 Cal.4th at p. 850.) To meet this burden, the defendant must show one or more elements of the cause of action cannot be established, or that there is a complete defense to that cause of action. (*Ibid.*)

Here, for example, the Gwilliam defendants argued that as to one of appellants' claims, they had not entered into an attorney-client relationship; and as to another, that they were not charged with the task at issue. And as described in detail above, both sets of defendants argued that appellants could not show any damage caused by any claimed misconduct, that nothing they did caused appellants damage. To put it in professional negligence terms, defendants argued no causation and no damage, two of the four elements of a professional negligence case. (*Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1199 (*Coscia*).) In summary judgment terms, defendants showed " 'one or more elements of' the 'cause of action' in question 'cannot be established.' " (*Aguilar, supra,* 25 Cal.4th at p. 850.)

To the extent that appellants argue that defendants failed to meet their burden because they did not negate appellants' claim that in connection with the July 21 letter, Wallace and Gwilliam were claimed to have said the letter was "mere posturing" and that LLNL "would almost certainly not" prevail, such is disingenuous: as noted, that was not alleged in the complaint and Kley did not give any such testimony in discovery. [3]

---

[3] At oral argument appellants' counsel represented that Kley was not asked.

Regardless, appellants were given multiple opportunities to rebut defendants' evidence, permitted to file an amended expert declaration, an amended separate statement, and two supplemental briefs, all of which Judge McGuiness could consider, including appellants' own evidence. (*Villa v. McFerren* (1995) 35 Cal.App.4th 733, 749–750; *San Diego Watercrafts, Inc. v. Wells Fargo Bank, N.A.* (2002) 102 Cal.App.4th 308, 316; *Namikas v. Miller* (2014) 225 Cal.App.4th 1574, 1585.)

Finally, to the extent that appellants assert that defendants provided no expert declaration, numerous cases have upheld summary judgments without any expert declaration. (See, e.g., *Namikas v. Miller, supra,* 225 Cal.App.4th at p.1574; *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1093 [recognizing that even a plaintiff's claim for legal malpractice may succeed " 'unassisted by expert testimony' "]; *Wright v. Williams* (1975) 47 Cal.App.3d 802, 810.) And appellants have cited no case holding that issues of causation and/or damage cannot be resolved without such testimony.

**The Law of Summary Judgment**

"[S]ummary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To prevail on a summary judgment motion, the moving defendant has the initial burden to show a cause of action has no merit because an element of the claim cannot be established or there is a complete defense to the cause of action. (*Id.*, subd. (o); *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) To satisfy this burden, the defendant must present evidence which either conclusively negates an element of the plaintiff's cause of action, or which shows the plaintiff does not possess, and cannot reasonably obtain, needed evidence. (*Aguilar v. Atlantic Richfield Co, supra,* 25 Cal.4th at p. 855.) Once the defendant has made this showing, the burden shifts to the plaintiff to set forth specific facts which show a triable issue of material fact exists. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477.)

"We review the trial court's decision de novo, considering all the evidence presented by the parties (except evidence properly excluded by the trial court) and the

uncontradicted inferences reasonably supported by the evidence.  (*Merrill v. Navegar, Inc., supra,* 26 Cal.4th at p. 476.)  The evidence is viewed in the light most favorable to the plaintiff, liberally construing the plaintiff's submissions while strictly scrutinizing the defendant's showing, and resolving any evidentiary doubts or ambiguities in the plaintiff's favor.  (*Saelzler v. Advanced Group 400, supra,* 25 Cal.4th at p. 768.)" (*Namikas v. Miller, supra,* 225 Cal.App.4th at p. 1581; accord, *Nazir v. United Airlines, Inc., supra,* 178 Cal.App.4th at pp. 253–254.)

### The Law of Professional Negligence

We set forth the law of professional negligence in *Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 165–166 (*Filbin*):

" 'The failure to provide competent representation in a civil or criminal case may be the basis for civil liability under a theory of professional negligence.  In a legal malpractice action arising from a civil proceeding, the elements are (1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence.'  (*Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1199.)

"Concerning the third and fourth of these elements, our Supreme Court cautioned: 'If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort.  [Citation.]  The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence.'  (*Budd v. Nixen* (1971) 6 Cal.3d 195, 200; cf. *Hecht, Solberg, Robinson, Goldberg & Bagley LLP v. Superior Court* (2006) 137 Cal.App.4th 579, 591 ['In the legal malpractice context, the elements of causation and damage are particularly closely linked.']; 4 Mallen & Smith, Legal Malpractice (2012 ed.) § 37:15, p. 1509 ['Causation connects the element of fault to the fact of injury. . . . [T]he question may be whether the claimed damage was caused by the alleged

20

wrongful conduct.  The opposite perspective is whether the alleged misconduct . . . caused legally cognizable damage.']).)

"From this caution has come the principle that 'Damage to be subject to a proper award must be such as follows the act complained of *as a legal certainty . . . .*" (*Agnew v. Parks* (1959) 172 Cal.App.2d 756, 768, italics added, quoted in *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1048; *Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1512; *Slovensky v. Friedman, supra,* 142 Cal.App.4th 1518, 1528; *Barnard v. Langer* (2003) 109 Cal.App.4th 1453, 1461– 1462; *Marshak v. Ballesteros*[ (1999)] 72 Cal.App.4th 1514, 1518; *Thompson v. Halvonik* (1995) 36 Cal.App.4th 657, 663.)  Conversely, ' " '[t]he mere probability that a certain event would have happened, upon which a claim for damages is predicated, will not support the claim or furnish the foundation of an action for such damages.' " ' (*Marshak v. Ballesteros, supra,* at p. 1518.)

"To prevail in a legal malpractice action, '[s]imply showing the attorney erred is not enough.'  (*Orrick Herrington & Sutcliffe v. Superior Court* (2003) 107 Cal.App.4th 1052, 1057.)"  *Filbin, supra,* at pp. 165–166, fns. omitted.)

In light of those principles, we turn to the issues before us, to determine whether there is any triable issue of material fact as to any of appellants' claims of professional negligence.  We conclude there is not—that none of appellants' claims has merit.

**Summary of Appellants' Claims**

Despite the hundreds and hundreds of pages of material, despite the extent of the claimed "evidence" underlying both sides of the motions, despite Kley's extensive testimony about the claimed lack of experience of Wallace and his claimed statements to Kley—in short, despite all the verbiage—appellants' claims against defendants can be synthesized to three:  one against both the Wallace defendants and the Gwilliam defendants, and two against the Gwilliam defendants alone.  As appellants themselves describe it in the reply brief, Mr. Lerman's supplemental declaration "expressed the same expert opinions as he had done previously, *vis.*:

21

"(1)  that the Wallace Defendants and the Gwilliam Defendants fell below the standard of care by failing to advise Kley, following his deposition in the underlying action and receipt of the July 21, 2009 letter from LLNL . . . of the serious financial risks posed to the Kley Parties in proceeding with those claims [citation];  [¶] . . . [¶]

 "(3)  that the Gwilliam Defendants fell below the standard of care by failing to advise Kley on October 22, 2007, after having reviewed his case and having decided not to accept it, that the statute of limitations on his claims could arguably run as early as November, 12, 2007 [Citation.]"  [¶] . . . [¶]

"(5)  that the Gwilliam Defendants fell below the standard of care by failing either to move, or to advise Kley of the need to move, to tax or allocate costs following entry of judgment in the underlying action [citation]".

One other thing appellants tell us, despite Kley's testimony, whether new or not, about attorney Wallace's lack of experience and his supposed motivation for agreeing to represent appellants in the "crappy" case, appellants "have *not* sought to ground liability of the Wallace Defendants on Wallace's failure to be candid with Kley about his lack of experience."

**The Claim Based on the July 21 Letter**

As mentioned, following Kley's deposition, LLNL's attorney sent Wallace the July 21 letter demanding that the misappropriation and fraud claims be dismissed based on the statute of limitations, and threatening to seek sanctions pursuant to Code of Civil Procedure section 128.7.  Wallace sent the letter to Kley and also to Gwilliam.  The letter was not responded to, and LLNL was successful in obtaining summary adjudication on the claims, and later attorney fees.

Appellants thereafter filed the main action against the Wallace and Gwilliam defendants, accusing them of malpractice with the allegations quoted above.  Extensive discovery ensued, and responding, for example, to that from the Wallace defendants, appellants apparently contended that those defendants were negligent in two particulars: (1) failing to anticipate the statute of limitations defense and marshalling evidence

22

necessary to defend against it; and (2) failing to advise appellants of the financial risks involved in the face of the July 21 letter.

In response to written discovery, appellants admitted that the Wallace defendants did not maintain the trade secrets case in bad faith. Rather, appellants asserted that it was the manner in which the Wallace defendants litigated, and that with a different strategy the Wallace defendants could have negated LLNL's statute of limitations defense. Appellants also claimed that they failed to explain the financial risks to appellants of their continuing to pursue certain claims in the case against LLNL. When asked to identify their damages, appellants did not include the attorney fees and costs awarded against them, claiming their damages were what appellants could have recovered from LLNL had they won.

Kley was deposed as appellants' person most knowledgeable, and testified that appellants lost the case against LLNL for reasons extrinsic to actions by either set of defendants. He testified he did not know what the Wallace defendants had done wrong because he was not a lawyer and that he did not know why he had consulted with a malpractice attorney, and was essentially unable to identify the damages appellants were seeking. Specifically asked whether the attorney fees awarded against appellants were being sought as damages, Kley refused to answer, his counsel objecting on the basis of the attorney-client privilege and as calling for expert testimony.

Against that background, the Wallace defendants moved for summary adjudication, their basic premise that the evidence established that no act or omission on their part caused the loss of appellants' underlying claims.

In response to the motion, appellants essentially abandoned their fundamental contentions asserted in discovery. Rather, relying on testimony in Kley's declaration—testimony he had not given before—appellants focused on three different facts vis-à-vis the Wallace defendants: (1) the Wallace defendants (and the Gwilliam defendants) told Kley that the threats in the July 21 letter were "mere posturing," that LLNL's motion for summary adjudication would almost certainly not succeed, and that had the attorneys provided different advice, appellants would have dismissed the fraud and

23

misappropriation claims; (2) Wallace failed to tell appellants of his lack of jury trial experience, and had Wallace so informed Kley he would never have engaged him; and (3) Wallace failed to advise appellants that he was only taking on their "crappy" case to get state court trial experience and with different information appellants would have found other counsel. As indicated, the second and third items have now been abandoned.

Appellants inserted these claims into the case through Kley's declaration, and an expert declaration by Mr. Lerman who, basing his conclusions upon the facts in Kley's declaration, opined that defendants breached the standard of care and caused damage to appellants. Thus, Mr. Lerman's opinion in his supplemental declaration: "Had Kley been advised that absent dismissal, GN and Metadigm faced a substantial possibility that the trial court would grant summary adjudication of the misappropriation of trade secrets claim on statute of limitations grounds, that GN and Metadigm would thereby be exposed to the substantial possibility of having to pay LLNL's attorney's fees incurred through the date of the motion, that Kley faced a substantial possibility that the trial court would grant summary adjudication of the fraud claim on statute of limitations grounds, and that Kley would thereby be exposed to the substantial possibility of having to pay LLNL's costs incurred through the date of the motion, Kley would have insisted that the claim for misappropriation of trade secrets claim [*sic*] and the claim for fraud be dismissed." And, Mr. Lerman testified, "It is therefore more likely than not that the abovementioned acts and/or omissions of Wallace, falling below the standard of care, caused GN and Metadigm to incur damages in the amount of the $189,565.50 award of attorney's fees assessed by the court against GN and Metadigm and caused Kley to incur damages in the amount of the $121,706.49 cost award assessed by the court against GN, Metadigm, and Kley."

Judge McGuiness sustained objections to the opinion on the grounds of lack of foundation, speculation, and inadmissible opinion. Indeed.

It is probably enough to note that Mr. Lerman's declaration did not accurately represent the record here and the basis of the attorney fees award, in at least two particulars. The first was the work for which the fee was awarded by the trial court,

24

which was the fees spent on the motion—not, as Mr. Lerman put it, the "fees incurred through the date of the motion." Second, Mr. Lerman disregarded that the threat in the July 21 letter was of Code of Civil Procedure section 128.7 sanctions, and that the attorney fees actually awarded were pursuant to Civil Code section 3426.4, which provides that "If a claim of misappropriation is made in bad faith, . . . the court may award reasonable attorney's fees and costs to the prevailing party". Put otherwise, LLNL's motion for attorney fees did not rely solely on the statute of limitations, but also argued that appellants' claim for misappropriation was "objectively specious" because of appellants' "own admission that publications on which their misappropriation claim is based provided no actual evidence of misappropriation." LLNL also argued that appellants demonstrated subjective bad faith in bringing and maintaining the trade secrets action, citing, inter alia, evidence showing that appellants had no evidence of improper use or disclosure and refused to even identify the alleged trade secrets at issue.

All this is shown by how Division Five discussed the attorney fee issue, which was this:

"Next, appellants argue that, even if we affirm the trial court's ruling on summary adjudication, we should reverse its award of attorney fees, pursuant to section 3426.4, as an abuse of discretion. . . .

"1. *Background*

"Following trial, LLN[L] moved for an award of attorney fees and costs incurred in defending the misappropriation claim. LLN[L] argued: '[A]mong other things, [appellants] *brought* a trade secret claim with full knowledge that their claim was barred by the relevant statute of limitation.' . . . [¶] Appellants opposed the motion . . ., arguing that their misappropriation claim was not 'specious.' . . . [¶] . . . [T]he trial court granted, in part, LLN[L]'s motion for fees and costs. The trial court concluded: '[Appellants'] misappropriation claim was *objectively specious* and was maintained in bad faith after July 21, 2009. Leaving aside questions of the claim's ultimate validity, the Court finds that it was *initiated* at a point well past the running of the applicable limitations period. Moreover, it was doggedly maintained thereafter, despite Victor Kley's knowledge—as

25

admitted in his deposition—of the existence of the elements of the claim well before the limitations period ran." (*General Nanotechnology, supra,* at pp. 31–32, italics added.)

In short, Mr. Lerman's opinion failed to account for the actual basis of the award of attorney fees. In professional negligence terms, appellants' showing failed to demonstrate causation of damages—certainly not to a legal certainty. (*Filbin, supra,* 211 Cal.App.4th at p. 165.) His opinion was properly rejected.

Two cases are particularly instructive: *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953 (*Piscitelli*), and *Namikas v. Miller, supra,* 225 Cal.App.4th 1574. The claim in *Piscitelli* was that the attorney was negligent in failing to opt plaintiff out of a class action against an investment firm, as a result of which plaintiff's claims were released, claims that would have been presented to an arbitration panel. Denying defendant's motion in limine, the court ultimately allowed plaintiff's expert witness to testify that "Piscitelli would very likely have prevailed in getting both monetary relief as well as having his [broker's record] improved had the [NYSE] arbitration gone to completion." (*Piscitelli, supra,* 87 Cal.App.4th at p. 972.)

The Court of Appeal held that allowing such testimony was an abuse of discretion. Elaborating, the court began by noting that " 'an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact' (Evid. Code, § 805.) However, the admissibility of opinion evidence that embraces an ultimate issue in a case does not bestow upon an expert carte blanche to express any opinion he or she wishes." (*Piscitelli, supra,* 87 Cal.App.4th at p. 972, quoting *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178.) And the court concluded, it was error to admit an expert's opinion on how an underlying arbitration would have been decided. (*Piscitelli,* at pp. 973–974.)

In *Namikas v. Miller, supra,* 225 Cal.App.4th 1574, the claim was that the negligence of plaintiff's attorney caused plaintiff to make excessive spousal support payments. Defendant moved for summary judgment. Plaintiff opposed the motion with an expert declaration opining that the attorney breached the standard of care by failing to strongly recommend a forensic marital support analysis, and that plaintiff would have

26

done better at trial had he not settled based on his attorney's recommendation. (*Id.* at p. 1580.)

The court analyzed the issue against the background that "the parties do not dispute, that triable issues of material fact exist regarding whether respondents breached a duty of professional care. The question presented here is whether the evidence established the absence of any triable issue as to causation and damages." (*Namikas v. Miller, supra,* 225 Cal.App.4th at p. 1582.) The court held it did: "Namikas introduced (1) Mowrey's declaration and marital standard of living analysis, (2) Soudry's opinion that the use of the DissoMaster calculation resulted in a higher level of support than would have been obtained at trial, and (3) Judge Liebmann's order reducing spousal support in 2012. This evidence fell short of the showing of damage required to survive summary judgment. (See *Marshak, supra,* 72 Cal.App.4th at p. 1518.) To the extent this evidence implied that Namikas would have received a better outcome had he gone to trial, it failed to show 'what that better outcome *would* have been.' (*Ibid.*, italics added.)" (*Namikas v. Miller, supra,* at p. 1585.)

Likewise here. An expert's opinion "unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion" lacks evidentiary value and may be deemed conclusory. (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.) Such opinion "is only as good as the facts and reasons on which it is based." (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 763; *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1487 [declaration speculative and lacked sufficient foundation for opinion expressed].)

Beyond that, the undisputed evidence demonstrated that the "mere posturing" advice was not the cause of appellants pressing on. No, it was appellants themselves. That evidence showed that appellants knew of the "financial risks," and that Kley "steadfastly" maintained that he did not learn of the claims against defendants until 2007, and insisted on prosecuting his claims. This provided probable cause for defendants to do so. (*Marijanovic v. Gray, York & Duffy* (2006) 137 Cal.App.4th 1262; *Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 223.)

27

Defendants were presented with a situation where, on the one hand, Kley was adamant that he did not discover facts supporting appellants' claims until July 2007, and, on the other, LLNL contended that the claims were time-barred. Resolution of statute of limitations issues "is normally a question of fact." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 810, citing *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112.)[4] In sum, appellants did not raise a triable issue on causation with respect to their professional negligence claim, that but for their attorneys' negligent acts or omissions, they would have obtained a more favorable outcome. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241.)[5]

Witkin has a section entitled "Reasonable Exercise of Judgment," describing how an "attorney is not responsible for loss resulting from an honest and reasonable mistake of law or procedure," and observing that it is "obvious that no liability can be imposed for a considered and reasonable exercise of judgment about whether a particular count in a complaint should be pressed or abandoned." (1 Witkin, Cal. Proc. (5th ed. 2008) Attorneys, § 329, p. 425.) And the section concludes: "This point is developed at length in *Floro v. Lawton* (1960) 187 [Cal.App.2d] 657, where the court adds a doleful note of sympathy: 'It would appear that the possibility of a malpractice action is an occupational hazard for a lawyer. Of necessity he cannot win every case and there is always the possibility of his having as a client an irascible person who tenaciously clings to the belief, in the face of all evidence to the contrary, that his claim is robust and that the claim of his opponent is weak, and that it would be next to impossible for any lawyer to do otherwise than to secure a judgment as and for all that he has demanded.'

---

[4] Such is shown, for example, here, where there was a difference of opinion between the trial court and Court of Appeal as to when appellants' causes of action accrued: October 2004 for the former, November 2004 for the latter.

[5] As particularly pertinent to the Wallace defendants—and as Judge McGuiness held—there was no triable issue of fact as to causation because the Wallace defendants had left the case, and played no role in appellants' decision to maintain their claims through summary adjudication.

28

(187 [Cal.App.2d] 674.)  [Citation.]"  (1 Witkin, Cal. Proc., *supra*, Attorneys, § 329 at p. 425.)

### The Claim Based on the Gwilliam Defendants' Conduct in 2007

Appellants' second claim of professional negligence is based on Kley's interaction with the Gwilliam defendants in mid-2007.  The claim is that an attorney-client relationship was "form[ed]" at that time, requiring the Gwilliam defendants to represent appellants "with a level of care and competence equal to that of other attorneys in the community of which they were a part"; and that the duty was breached by "among other things, failing to advise [appellants], once it had been determined that the Gwilliam Defendants would not take on their case, of the steps they should take to protect their claims against [LLNL] and, in particular, failing to determine, and to advise [appellants] of, the date on which the statute of limitations on those claims was likely to run."

The claim fails for several reasons, beginning with the fact that no attorney-client relationship was formed at that time.  Contending the contrary, appellants' brief asserts that the "[e]vidence submitted by the Gwilliam Defendants in support of their motion confirmed that relationship as a matter of law."  Cited in claimed support are the three declarations submitted by the representatives of the Gwilliam firm and *Beery v. State Bar* (1987) 43 Cal.3d 802, 811 (*Beery*), cited for the proposition that " 'The fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result.' "  *Berry* is unsupportive.  And the facts are contrary.

While Kley's and Mr. Lerman's declarations assert, however conclusorily, that an attorney-client relationship was formed, Mr. Lerman's opinion is not availing.  As our colleagues in Division Four well put it, "An expert's speculations do not rise to the status of contradictory evidence, and a court is not bound by expert opinion that is speculative or conjectural.  [Citations.]  Plaintiffs cannot manufacture a triable issue of fact through use of an expert opinion with self-serving conclusions devoid of any basis, explanation, or reasoning.  [Citation.]"  (*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th

29

1098, 1106; see *Westrec Marina Management, Inc. v. Jardine Ins. Brokers Orange County, Inc.* (2000) 85 Cal.App.4th 1042, 1050–1051.)

Witkin has a section entitled "Distinction:  Opinion on Issue of Law" that discusses many cases lending support to the conclusion that Mr. Lerman's declaration was properly rejected on this point.  (1 Witkin, Cal. Evidence (5th ed. 2012), Opinion Evidence, § 98, pp. 745–747.)  The section begins with lengthy discussion of *Downer v. Bramet* (1984) 152 Cal.App.3d 837 and *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, the latter a wrongful death action alleging theories of liability based on nondelegable duty and negligent hiring arising from an accident in which a trailer loaded with corn became detached and tipped over onto the decedent's vehicle.  The defendants included the owner of the truck and trailer and the owner of the corn.  (*Id*. at p. 1159–1160.)  Plaintiff's counsel called an expert witness, a lawyer who specialized in transportation and practiced before the Public Utilities Commission, to give opinions to the effect that the corn owner had a nondelegable duty; that the truck owner was hauling illegally; that the contracts between the two owners were illegal; and that the corn owner was legally required to be registered as a contract carrier and was liable for the truck owner's acts.  The jury found both defendants liable.  The Court of Appeal reversed, holding that admission of the expert testimony was error, as the issue was one of law. (*Ibid*.)

The author then closes out the section with this:

"The view expressed in *Summers* is also reflected in the following cases:

"*Williams v. Coombs* (1986) 179 [Cal.App.]3d  626, 638, [testimony expressing opinion on legal question of probable cause was inadmissible as improper expert opinion].

"*Asplund v. Selected Inv. in Financial Equities* (2000) 86 [Cal.App.]4th 26, 49, . . . [in fraud action by plaintiff purchasers of promissory notes from registered representative of defendant broker-dealer, trial judge properly excluded declaration of plaintiffs' expert to effect that defendant had duty to supervise representative; existence of duty is legal issue within province of court to decide].

30

"*Thompson v. Sacramento City Unified School Dist.* (2003) 107 [Cal.App.]4th 1352, 1372, [in action against school district by student who was punched by another student, it was error to allow experts to testify that attack would not have occurred if certain security measures had been taken and there had been effective intervention with respect to assailant; party cannot rely on expert's opinion to establish duty, and speculative conclusion that different measures might have prevented injury cannot be used to establish causation; citing *Asplund*].

"*Amtower v. Photon Dynamics* (2008) 158 [Cal.App.]4th 1582, 1599 [in action alleging securities violations, trial judge did not err in limiting testimony of plaintiff's expert to prevent him from testifying as to whether defendants owed plaintiff fiduciary duty; existence of fiduciary relationship is question of law].

"*Amaral v. Cintas Corp. No. 2* (2008) 163 [Cal.App.]4th 1157, 1179, . . . [in class action against contractor by its employees for violations of state law and city's 'living wage' ordinance and breach of contractor's contract with city, trial judge did not err in refusing to allow contractor to introduce statements of city officials to effect that ordinance was vague and ambiguous]." (1 Witkin, Cal. Evidence (5th ed. 2012), Opinion Evidence, § 98, pp. 745–747.)

Those cases apply to reject Mr. Lerman's opinion here. So, too, because his opinion ignores the facts here, facts set forth in the declarations from the three Gwilliam firm representatives, especially that of Sonya Arellano, an attorney at the firm and the "intake clerk" there.

Ms. Arellano talked to Kley by telephone on July 26, 2007, following which she prepared an intake form. She provided Steven Brewer, a member of the firm, a memorandum describing her conversation with Kley, and Mr. Brewer indicated he needed more information. Ms. Arellano contacted Kley to obtain it, and then prepared a revised memorandum. Reading it, Mr. Brewer declined the representation and made a notation to that effect on the memorandum. Mr. Brewer nevertheless asked his partner, Steven Cavalli, to review the memorandum, which he did. Mr. Cavalli also declined the

case, and asked Ms. Arellano to "prepare a decline letter to Kley." That letter was sent to Kley on October 22, 2007. It provided in its entirety as follows:

"Re: *Your Potential Lawsuit(s)*

"Dear Mr. Kley,

"Thank you for consulting our office. We have concluded that it is not feasible for this law firm to represent you regarding your potential case.

"This letter is not intended to be an opinion concerning the merits of your case. We are not expressing an opinion as to whether you should take further action in this matter. We are merely indicating that we are unable to represent you and that we are not assuming any responsibility for any aspect of your case.

"You should *immediately* contact another attorney to obtain legal representation. There are strict time limitations within which you must act in order to protect your rights. These time limits are complex and vary for different types of legal actions.

"*You should act immediately if you wish to pursue this matter. Failure to file a lawsuit, claim and/or charge within the requisite time may mean that you could be barred forever from pursuing your action.*

"We regret that we could not take your case but wish you good luck in pursuing the matter with other counsel."[6]

The sum total of the evidence here is that Kley in 2007–2008 contacted 40 lawyers and firms, one of which was the Gwilliam firm, which he called, unsolicited. The Gwilliam firm did not investigate the case, it did not advise Kley about it, and it declined the representation. Judge McGuiness granted summary adjudication against appellants on the claim, holding that they "have not produced any admissible evidence or authority demonstrating that an attorney conducting an unsolicited telephone intake is required to advise a prospective client about the applicable statute of limitations and the discovery rules before declining the case." Judge McGuiness was correct. Appellants have cited no

---

[6] As quoted, Kley testified he did not receive the letter.

32

authority holding an attorney liable for professional negligence under such circumstances. *Beery*, the one case cited, certainly does not.

*Beery* was an attorney disciplinary proceeding based on Beery having solicited and obtained a loan from a client for a venture in which Beery was himself involved, without telling the client about that involvement. One of the issues dealt with the timing of Beery's meeting with the client, and thus whether an attorney-client relationship was in existence at the time. The Supreme Court concluded it was: "The evidence amply supports the existence of an attorney-client relationship at the time of the loan transaction. 'The fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result.' (*Westinghouse Elec. Corp. v. Kerr-McGee Corp.* (7th Cir. 1978) 580 F.2d 1311, 1319, fn. omitted.) 'When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie*.' [Citation.]" (*Beery, supra,* 43 Cal.3d at pp. 811–812.)

Here, the Gwilliam defendants were not consulted for legal advice, but rather whether they would agree to represent appellants. Unlike *Beery*, no advice was "secured." And to the extent that Mr. Lerman's conclusory declaration opines that the Gwilliam defendants had to advise Kley that the statute of limitations "could run as early as November 12, 2007," the declaration could be ignored. (See *Westrec Marina Management, Inc. v. Jardine Ins. Brokers Orange County, Inc., supra,* 85 Cal.App.4th at pp. 1050–1051.)

As noted above, the facts are that Kley was dealing with LLNL as early as 2003; and his last interaction was apparently in October 2004. But when Kley talked to Ms. Arellano in 2007, her notes reflect that Kley told her that the "contract [was] in 2005." Her notes also reflect that "7/17/07 discussed breach of contract." Whatever the facts, one would have to ask Mr. Lerman, what was the applicable statute (or statutes) of limitations the Gwilliam defendants must advise Kley of? For tort? Breach of contract? And when did it start to run? 2005? 2007? Or some other time? And for what claims?

33

All of this would require research—all in connection with a representation they were declining!

No attorney-client relationship was formed in 2007. The Gwilliam defendants owed appellants no duty at that time. (*Ishmael v. Millington* (1966) 241 Cal.App.2d 520, 525 [duty is a question of law]; *Martorana v. Marlin & Saltzman* (2009) 175 Cal.App.4th 685, 697.)

Mr. Lerman also opined that if the Gwilliam defendants had advised appellants as to the statute of limitations, Kley "would have immediately hired an attorney on an hourly basis to timely file [the complaint]," which "would have prevented the superior court from assessing, and the court of appeal from confirming, an award of attorney's fees to [LLNL], and against GN and Metadigm, pursuant to Civil Code § 3426.4." Such an opinion relies on multiple levels of speculation, first as to how Kley would react to the advice, second as to the availability of an attorney to timely file the complaint, and finally as to whether attorney fees would have been awarded.

Judge McGuiness sustained objections to the paragraphs of Mr. Lerman's amended declaration stating how Kley would have reacted upon being advised of the statute of limitations on the grounds of lack of foundation, speculation, and inadmissible opinion. Again, Judge McGuiness was correct. (*McGonnell v. Kaiser Gypsum Co., supra,* 98 Cal.App.4th at p. 1106.)

Moreover, appellants failed to establish that an attorney was available to timely file the action on an hourly basis, or that appellants could have paid any such hourly rate, especially as "at least 40" attorneys declined the representation during the relevant time period. Finally, appellants' claim would fail due to the inability to establish damages. (*Filbin, supra,* 211 Cal.App.4th at p. 165; *Thompson v. Halvonik, supra,* 36 Cal.App.4th at p. 661.)

**The Claim in Connection with the Cost Bill**

Appellants' third claim of professional negligence is that the Gwilliam defendants breached the standard of care in failing to advise appellants of the necessity of filing "a motion to tax costs within fifteen days"; that had they done so, Kley would have "insisted

34

that his attorneys file a timely and appropriate motion to tax and/or apportion costs"; and that such a motion more likely than not "would have reduced the award of costs to which Kley, GN, and/or Metadigm were subject." The sole support for the claim is Mr. Lerman's opinion, an opinion again based only on Kley's declaration.

To begin with, it must be emphasized that the claim is not that the Gwilliam defendants did not file a motion to tax, but that they should have advised Kley of the necessity of having their "attorneys file a timely and appropriate motion to tax." As to this, the evidence in the record—evidence nowhere mentioned, let alone disputed, by appellants—was that following the adverse jury verdict, Gwilliam told Kley that LLNL would seek costs, and that the Gwilliam defendants "would work hard to see that it was minimized." Thereafter, Kley and the Gwilliam firm discussed possible representation on appeal, but appellants would not agree to the terms under which the Gwilliam firm would handle it. So, appellants retained Antognini, entering into a written retainer agreement with him, by which he would represent appellants in "all post-trial motions and appeals arising from [the trade secrets case]." And when appellants learned that in fact no motion to tax costs was filed, they fired Antognini. In light of that, appellants' claim fails for lack of causation. (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 253). And for the additional reason that appellants have shown no damage.

Despite two opportunities, appellants have not identified one single cost item that would—indeed, even might—have been taxed, not one cost item that was not allowable. Neither of Mr. Lerman's declarations identifies any cost item that was not allowable. Instead, in conclusory fashion, Mr. Lerman states, "It is more likely than not that [a motion to tax] would have reduced the award of costs to which Kley, GN, and/or Metadigm were subject." That is manifestly insufficient.

A requisite element of a legal malpractice claim is damage, damage, as we confirmed in *Filbin*, that must be shown to a legal certainty. (*Filbin, supra,* 211 Cal.App.4th at p. 165.) As other Courts of Appeal have put in it, negligent conduct—and no such conduct is shown by defendants here—that does not cause damage

" 'generates no cause of action in tort.' " (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 130–131.)  Appellants must show " 'what the better outcome *would* have been.' " (*Namikas v. Miller, supra,* 225 Cal.App.4th at p. 1585; *Marshak v. Ballesteros, supra,* 72 Cal.App.4th at p. 1518.)  This, they failed to do.

## DISPOSITION

The summary judgment is affirmed.  Defendants shall recover their costs on appeal.

_____
Richman, Acting P.J.

We concur:

_____
Stewart, J.

_____
Miller, J.